**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**LOCAL 32B–32J SERVICE EMPLOY-EES INTERNATIONAL UNION, AFL–CIO, Respondent.**

**Docket No. 02–4220.**

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 2003.

Decided Dec. 30, 2003.

198

Joan E. Hoyte, National Labor Relations Board, Washington, D.C. (Arthur F. Rosenfeld, General Counsel, John F. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, National Labor Relations Board, Washington, D.C., of counsel), for Petitioner.

Harold Craig Becker, Chicago, IL (Larry Engelstein, General Counsel, SEIU Local 32B–32J, New York City, of counsel), for Respondent.

Before: OAKES, MESKILL and B.D. PARKER, Circuit Judges.

MESKILL, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order that Local 32B–32J, Service Employees International Union, AFL–CIO (Union) cease and desist from engaging in activities deemed to be unfair labor practices. We hold that the Board's construction of the contract clause at issue was incorrect. Accordingly, we deny the petition.

## BACKGROUND

The relevant facts, as found by the Board and the ALJ, are essentially uncontested. *See Local 32B–32J, Service Employees International Union, AFL–CIO and Pratt Towers,* 337 NLRB 317 (2001). In April 1998, the Board certified the Union as the exclusive collective-bargaining representative of a unit of employees of Pratt Towers, Inc. (Employer). In August, the Union and the Employer began negotiations for a collective-bargaining agreement. The Union presented alternative contract proposals, and the parties agreed on one, the "Independent Agreement," as the starting point for negotiations. Article IV, Section 5 of the Independent Agreement is a so-called picket line clause, which states: "No employee covered by this agreement should be required by the Employer to pass picket lines established by any Local of the Service Employees International Union in an authorized strike."

A series of negotiations followed, in which the parties agreed to some changes to the Independent Agreement, but disagreed as to other changes. When the final bargaining session ended on January 7, 1999, the parties had failed to agree on nine points in the Independent Agreement. Throughout the negotiations, the disagreements related solely to the economic provisions in the proposal. At no time did the Employer object to the picket line clause.

When negotiations broke down, the Union's counsel and chief negotiator told the Employer's representatives that the Union would strike if the Employer did not accept "as is" the Union's Independent Agreement proposal. The Employer continued to object to certain economic provisions; as a consequence, on February 22, the Union struck.

The strike was unsuccessful and the employees sought to return to work. At this stage, the Employer filed a charge alleging that the strike violated section 8(b)(4)(ii)(A) of the Labor Management Relations Act (the Act), 29 U.S.C. § 158(b)(4)(ii)(A), because its object was to coerce the Employer to agree to a picket line clause that violated section 8(e) of the Act, 29 U.S.C. § 158(e).

Section 8(b)(4)(ii)(A) of the Act provides that it is an unfair labor practice for a Union to coerce any person when "an object thereof is ... forcing or requiring an employer ... to enter into any agreement which is prohibited by [section 8(e) of the Act]." Section 8(e), in turn, prohibits unions and employers from entering into contracts containing so-called "hot-cargo provisions." "Hot cargo" provisions protect

employees' refusals to cross illegal secondary picket lines.[1]

The Administrative Law Judge (ALJ) held that the picket line clause constituted a hot-cargo provision. However, he held that the strike did not violate section 8(b)(4)(ii)(A) because the objective of the strike was not to force the Employer to agree to the picket line clause, but rather to coerce the Employer to agree to the economic provisions to which it had objected. For this reason, the ALJ dismissed the charge against the Union.

On review, the Board sustained the ALJ's holding that the picket line clause was a hot cargo provision but held that the Union engaged in unfair labor practices because the strike violated section 8(b)(4)(ii)(A). The Board ordered the Union to cease and desist from engaging in this practice and to post a notice confirming its commitment to stop violating the Act. In addition, as a consequence of this ruling, those employees who took part in the strike could be fired by the Employer.

## DISCUSSION

The Union urges us to deny enforcement of the Board's order on two alternative grounds: (1) the picket line clause is not a hot cargo provision, and (2) even if it is a hot cargo provision, the strike did not violate section 8(b)(4)(ii)(A) because, as the ALJ held, its purpose was not to force the Employer to agree to the picket line clause. We agree that the picket line clause in question should not have been interpreted as a hot cargo provision. It is therefore unnecessary for us to reach the question of whether the strike violated section 8(b)(4)(ii)(A), and we decline to do so.

### 1. Standard of Review

■ Our scope of review is limited. We will uphold the Board's factual findings if they are supported by "substantial evidence." 29 U.S.C. § 160(e) & (f); *Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 265 (2d Cir.2000). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elec. Contractors v. NLRB*, 245 F.3d 109, 116 (2d Cir.2001) (internal quotation marks omitted). In addition, we give "deference to the Board's reasonable interpretation of labor contracts, in light of its expertise." *NLRB v. Truck Drivers Local Union No. 449*, 728 F.2d 80, 84 (2d Cir.1984). But see *Miss. Power Co. v. NLRB*, 284 F.3d 605, 619 (5th Cir.2002) (Court owes no deference to the Board's interpretation of a contract clause); *BP Amoco Corp. v. NLRB*, 217 F.3d 869, 873 (D.C.Cir.2000) (same).

### 2. The Picket Line Clause

■ An unlawful hot cargo provision is a provision in a labor agreement that protects employees who refuse to cross secondary picket lines from adverse action by the employer. See *Truck Drivers Union Local No. 413 v. NLRB*, 334 F.2d 539, 543 (D.C.Cir.1964). In determining whether a picket line clause in a labor agreement is a hot cargo provision, it is therefore necessary to determine whether the clause in question seeks to protect employees who engage in unlawful second-

---

**1.** Section 8(e) provides, in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from ... doing business with any other person, and any contract or agreement entered into ... containing such an agreement shall be to such extent unenforceable and void.

29 U.S.C. § 158(e).

ary strikes, or only those who engage in lawful primary strikes.

■ In this case, the picket line clause in the Independent Agreement states: "No employee covered by this agreement should be required by the Employer to pass picket lines established by any Local of the Service Employees International Union in an authorized strike." The parties agree that the picket line clause limits protection afforded employees to those taking part in *"authorized"* strikes. They disagree, however, on the proper interpretation of the word "authorized." The Board understands the word to mean that employees are protected if they engage in any strike that is "authorized *by the Union,*" even if that strike is unlawful. Read this way, the clause is clearly a hot cargo provision. The Union, on the other hand, argues that the clause should be understood to protect employees who engage only in strikes that are "authorized *by law*". This reading renders the clause lawful because it would not protect employees who engage in unlawful secondary strikes. In other words, the parties agree that understanding the word "authorized" requires the interpreter to supply additional words to the clause, but they disagree as to which words should be supplied.

We understand the Board to make two arguments supporting its conclusion that the word "authorized" must be read to mean "authorized by the Union." First, the Board suggests that the word "authorized" is unambiguous when used in the context of providing authorization to strike, both because it has such a settled meaning at law and because it is generally used that way. Second, the Board appears to argue that even if the word "authorized" is ambiguous in this context, it must be given the broadest reading to which it is reasonably amenable. We find both arguments unavailing.

The Board's first argument, that the word "authorized" in this context has a settled meaning, is undermined by the very case to which the Board cites. In *NLRB v. Bay Counties District Council of Carpenters,* 382 F.2d 593, 594 & n. 3 (9th Cir.1967), the picket line clause in question, which was determined to be a hot cargo provision, was entitled "Employees Not To Be Discharged for Recognizing Authorized Lines." The Board suggests that the use of the term "authorized" is what required the court to construe the clause as a hot cargo provision. This is plainly incorrect. The body of the clause at issue in *Bay Counties* stated: "No employee covered hereby may be discharged by an individual employer for refusing to cross a picket line established by an International Union." *Id.* at n. 3. In other words, unlike in the present case, the clause itself defined what the term "authorized" meant, and as used there, it was clearly broad enough to cover secondary strikes. Indeed, if the word "authorized" unambiguously means "authorized by the Union," it would have been unnecessary for the clause in *Bay Counties* to further define its meaning.

Similarly, the ALJ's opinion, the relevant part of which was adopted by the Board, cites various cases construing picket line clauses as hot cargo provisions. *Local 32B–32J,* 337 NLRB at 325 & 326 n. 17. The ALJ seems to have concluded from these cases that the meaning of the word "authorized" is unambiguous. However, unlike this case, where the words "by the Union" or "by law" must be inferred to give the clause meaning, in the cases cited by the ALJ it was unnecessary to supply any additional language because the clauses were clearly broad enough to protect employees engaged in secondary strikes. *See General Truck Drivers, Local 467 (Mike Sullivan and Associates),* 265

NLRB 1679, 1679–81 (1982) (clause protected employees who refuse to "cross a picket line."); *Int'l Union of Operating Engineers, Local Union No. 12*, 220 NLRB 530, 531 (1975) (employer would not force any employee to "cross any picket line . . . authorized by any of the Building and Construction Trades Councils, AFL–CIO Central Labor Councils, or the International Union of Operating Engineers, Local Union No. 12"); *Local 445, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Edward L. Nezelek, Inc.)*, 194 NLRB 579, 585 (1971) (clause provided that the "[e]mployer shall not discharge or suspend or otherwise discipline any Employee for refusing to cross a picket line"). *See also Brotherhood of Painters, Local No. 823 (Independent Painting Contractors of New Mexico)*, 161 NLRB 620, 628 (1966) (clause protected employees who respect "any picket line established by any labor organization"); *Hodcarriers' and Construction Laborers' Union Local 300 (Jones and Jones, Inc.)*, 154 NLRB 1744, 1744 n. 3 (1965) (clause prohibited employer from requiring employees "to cross any picket line or enter any premises at which there is a picket line authorized or approved by [the union]").

In a related argument, the Board seems to suggest that the term "authorized" is unambiguous in this context because when people use the word "authorized" to mean "provide authority to strike," they generally refer to the union as the source of authority. In other words, it is the *union*, rather than the *law*, that authorizes strikes. This argument is not without some force. The Supreme Court itself has used the term "authorized strike" without elaboration where it is clear from context that the term "authorized" refers to union authorization. *See Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 216 n. 5, 100 S.Ct. 410, 62

L.Ed.2d 394 (1979) ("An international union, of course, is responsible under § 301 for any authorized strike.").

Nevertheless, this argument is ultimately unavailing because there are also instances in which the word "authorize" clearly refers to the law's authorization to strike, rather than a union's. For instance, in *NVE Constructors v. NLRB*, the court cited to the Congressional Record and quoted Senator Kennedy as saying, "nor was it the intention of the committee to authorize a labor organization to strike." 934 F.2d 1084, 1087 n. 5 (9th Cir.1991) (quoting 2 *Legislative History of the Labor–Management Reporting and Disclosure Act of 1959*, at 1715 (1959)). Ironically, the Board itself has used the word "authorize" to refer to *statutory* authorization. In *Donald Schriver, Inc. v. NLRB*, the court quoted the Board's own brief, which stated that "Congress did not intend to authorize minority construction unions to strike." 635 F.2d 859, 868 n. 11 (D.C.Cir.1980). Therefore, we reject the Board's argument that the word "authorized" in this context has a settled meaning at law or a colloquial meaning that should be inferred. When used without further elaboration, it may mean either "authorized by the Union" or "authorized by law."

Having established that an ambiguity exists, it is next necessary to determine how to resolve the ambiguity. The Board appears to argue that ambiguous picket line clauses must be read broadly and interpreted as hot cargo provisions, at least if such a meaning could reasonably be ascribed to them. This misconstrues the law and its application to this case. It may be true that a clause that is broad enough on its face to protect even those employees engaged in unlawful secondary strikes must be interpreted to be a hot cargo provision. *See General Truck Drivers, Local 467*, 265 NLRB at 1681 ("It is

irrelevant whether the Union only intended for the clause to apply to lawful primary picketing.... What is relevant is whether the 'picket line' clause on its face is limited to lawful primary activity or whether its terms are so broad that it applies to unlawful secondary picketing as well. In the latter instance, the clause perforce violates the strictures of Section 8(e).")." However, this rule does not require a court to interpret an ambiguous term in such a way as to render the clause unlawful; rather, it only prevents a court from changing the meaning of a clause where the clause is clear on its face by adding terms. As demonstrated above, the term "authorized" is ambiguous, and requires elaboration either by adding the words "by *law*" or "by *the Union.*"

█ The rules of contract interpretation, when properly applied, require us to agree with the Union. The law is well settled that "ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." *Walsh v. Schlecht,* 429 U.S. 401, 408, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977). *See also Venizelos S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir.1970) ("[I]f an agreement is fairly capable of a construction that will make it valid and enforceable, that construction will be given it."). The Board itself has adopted this rule of interpretation. *General Teamsters, Local 982 (J.K. Barber Trucking Co.),* 181 NLRB 515, 517 (1970) (If a "clause is not clearly unlawful on its face, the Board will interpret it to require no more than what is allowed by law.").

We are mindful that this is merely a presumption; if there is evidence to suggest that the parties intended the clause to be read more broadly, it would be appropriate to consider that evidence when construing the clause. As the Board has previously stated, "[i]f a clause is ambiguous, the Board in a Section 8(e) proceeding will not presume unlawfulness, but will consider extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner." *Ets–Hokin Corp.,* 154 NLRB 839, 841 (1965). Because the record in this case reveals no such evidence, it was unreasonable for the Board to have failed to apply its own *Ets–Hokin* analysis. That is, in interpreting the ambiguous term "authorized," the Board should not have presumed to render the clause unlawful, but rather should have sought extrinsic evidence. In the absence of such evidence, the accepted rules of statutory construction control, and the clause should be rendered "authorized by law," rather than "authorized by the Union."

## CONCLUSION

We conclude that there is no evidence in the record, let alone substantial evidence, from either the language of the clause itself or the circumstances surrounding the Union's proposal to include the clause, to support the Board's conclusion that the clause in question is a hot cargo provision. For this reason the Board's interpretation of the picket line clause, which ignores its own rules of contract interpretation, is unreasonable. Accordingly, we deny the petition to enforce the order.[2]

█

**2.** Because we have reached this conclusion, we find it unnecessary to address the Union's

second argument that it did not initiate a strike for the purpose of coercing the Employer to agree to the picket line clause.