06-0530-cv
Eli Lilly do Brazil v. Federal Express Corp.

**UNITED STATES COURT OF APPEALS**
FOR THE SECOND CIRCUIT
_____

August Term, 2006

(Argued: September 22, 2006                    Decided: September 11, 2007)

Docket No. 06-0530-cv
_____

ELI LILLY DO BRASIL, LTDA,

*Plaintiff-Appellant,*

— v.—

FEDERAL EXPRESS CORPORATION,

*Defendant-Appellee.*

_____

Before:          MESKILL, B. D. PARKER, & RAGGI, *Circuit Judges.*

_____

        Appeal from a judgment of the United States District Court for the Southern District of New York (Lynch, *J.*) granting Federal Express enforcement of a damage limitation clause in a waybill governing the transportation of cargo.  AFFIRMED.

        Judge Meskill dissents in a separate opinion.

_____

MARTIN F. CASEY, Casey & Barnett, LLC, New York, N.Y., *for Appellant Eli Lilly do Brasil, Ltda.*

ROBERT R. ROSS, Federal Express Corporation, Memphis, Tenn., *for Appellee Federal Express Corporation*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Eli Lilly do Brasil ("Lilly") contracted with Federal Express ("FedEx") to ship drums of pharmaceuticals from Brazil to J§apan. While being trucked in Brazil, the shipment was stolen. This appeal considers whether the limitation on liability in FedEx's waybill is enforceable and the answer depends on whether federal common law or Brazilian law applies.

The United States District Court for the Southern District of New York (Lynch, *J.*) agreed with FedEx that federal common law applied, under which the limitation was enforceable. The District Court declined Lilly's invitation to apply Brazilian law, under which Lilly contended the clause would have been invalid if gross negligence were shown. The District Court concluded that to do so would serve "to invalidate the liability limitations to which the parties voluntarily bound themselves" and would disturb the parties' justified expectation that their contract was enforceable. We agree and we affirm.

## I. BACKGROUND

In October 2002, Lilly contracted with Nippon Express do Brasil, who, in turn, subcontracted with FedEx to transport fourteen drums of Cephalexin from Lilly's factory in Guarulhos, Brazil to Narita, Japan, through FedEx's hub in Memphis. FedEx received the cargo and consigned it to Jumbo Jet Transportes Internacionais Ltda. for transportation by truck to

Viracopos, Brazil. The truck was hijacked en route and the cargo, worth approximately $800,000, was stolen.

The waybill for the shipment limited FedEx's liability for stolen goods to $20 per kilogram. If a customer, such as Lilly, was dissatisfied with the limitation, it was given the option of securing additional coverage by declaring a higher value and paying additional charges.[1]

The limitation of liability on the face of the waybill was conspicuous.[2] Lilly did not elect

---

[1]The waybill provides:

If the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention may be applicable and the convention governs and in most cases limits the liability of the Carrier in respect of loss, damage, or delay to cargo to 250 French gold francs per kilogramme [indicated to be approximately USD $20.00 per kilogram], unless a higher value is declared in advance by the shipper and a supplementary charge paid if required.
. . . .
(4) Except as otherwise provided in Carrier's tariffs or conditions of carriage, in carriage to which the Warsaw Convention does not apply Carrier's liability shall not exceed US $20.00 or the equivalent per kilogramme of goods lost, damaged or delayed, unless a higher value is declared by the shipper and a supplemental charge paid.

[2]The limitation specifies:

ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HEREON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE CARRIED VIA INTERMEDIATE STOPPING PLACES WHICH THE CARRIER DEEMS APPROPRIATE. THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

to declare a higher value or to pay for additional coverage. The record is silent as to the circumstances of the theft. It is not disputed that, if the limitation applied, FedEx's exposure for the loss was approximately $28,000.

Lilly, a Brazilian firm, chose not to sue FedEx in Brazil but instead sued in the Southern District of New York. The parties cross-moved for partial summary judgment. FedEx sought to limit its liability in accordance with the waybill and Lilly sought to have Brazilian law applied, believing that the limitation might not be enforceable if it could prove that the trucking company acted with gross negligence. Both parties assumed that federal common law choice-of-law analysis applied but they disagreed as to the results of that analysis.

The District Court granted FedEx's motion, ruling that substantive federal common law, not Brazilian law, applied and, as a result, the limitation was valid. The court's choice-of-law analysis, relying on the Restatement (Second) of Conflict of Laws (the "Restatement"), determined that Brazil had an interest in "regulating the liability of – and corollary standards of care to be exercised by – carriers transporting goods within its borders." The court then reasoned that because of Brazil's numerous contacts with the transaction, it undoubtedly had a significant interest in regulating the transaction, while the United States had only a "general policy interest in limiting the liability of FedEx as a federally-certified air carrier."

After considering all the Restatement factors, however, including several that favored Lilly, the court concluded that federal common law, which accords primacy to vindicating the parties' justified expectations, trumped Brazilian law. Specifically, Judge Lynch found that because United States law would enforce the contract as written and Brazilian law might permit

4

the contract to be disregarded, "Brazil's interests in defining the liability of carriers operating within its borders, even taking into account its considerable contacts with the transaction, are not so strong here as to occasion unsettling the private agreement of these particular parties, who, to the extent they were aware of Brazilian law, opted to contract around it." Heavily weighting this factor, the court concluded that the United States is "the jurisdiction with the most significant relationship to the transaction and the parties." After the parties stipulated the amount of damages, the court entered a judgment for Lilly in accordance with the limitation in the waybill. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

We review *de novo* the district court's determination that federal law applies, *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998); the district court's determinations regarding questions of Brazilian law, *id.*; Fed. R. Civ. P. 44.1; as well as the district court's resolution of the cross-motions for summary judgment, *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000).

### B. Choice of Law Analysis

Although the Supreme Court has cautioned that it is appropriate for courts to apply federal common law in only a "few and restricted" instances, *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (internal quotation marks omitted), this Court has recognized that cases involving the liability of air carriers for lost or damaged freight are controlled by federal common law, *see Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 59 (2d Cir. 2000). Because this appeal requires us to consider FedEx's liability for lost shipment of

5

freight, and since the parties have conceded the issue, a federal common law choice-of-law analysis is appropriate.

As our prior cases indicate, when conducting a federal common law choice-of-law analysis, absent guidance from Congress, we may consult the Restatement (Second) of Conflict of Law. *See Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996); *see also DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 923 (6th Cir. 2006) (turning to the Restatement where prior caselaw did not address the choice-of-law question at issue); *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) ("Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws.").

In general, "[t]he federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992). As to the transportation of goods, § 197 of the Restatement provides:

> The validity of a contract for the transportation of passengers or goods and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state from which the passenger departs or the goods are dispatched, *unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the contract and to the parties, in which event the local law of the other state will be applied*.

Restatement (Second) of Conflict of Laws § 197 (emphasis added).

Section 6 identifies a number of factors relevant to determining which state has the more significant relationship with the parties and the contract:

> a) the needs of the interstate and international systems,
> b) the relevant policies of the forum,

c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

d) the protection of justified expectations,

e) the basic policies underlying the particular field of law,

f) certainty, predictability and uniformity of result, and

g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

Brazil's interests in the contract and the parties are by no means insignificant. The contract was negotiated and executed in Brazil, between a Brazilian company and a United States company that regularly transacts business in Brazil. The purpose of the contract was to ship goods located in Brazil, out of Brazil to Japan. The goods did not enter the United States and would have done so only because Memphis is the FedEx transship center. These considerations are important ones to the § 6 analysis. *See id.* § 188(2) (stating that the principles of § 6 should be analyzed taking into account, among other things, the place of negotiation of the contract, the place of performance, and the place of business of the parties). As explained in the Restatement, the § 188 contacts serve to identify "[t]he states which are *most likely* to be interested," namely those states "which have one or more of the [section 188] contacts with the transaction or the parties." *Id*. § 188 cmt. e (emphasis added). Section 188, like § 197, thus establishes something akin to a default rule based on a non-exhaustive list of contacts. In moving beyond the default rule to a determination of what rule of law applies in a particular circumstance, the contacts are "to be taken into account in applying the principles of § 6." *Id*. § 188(2). However, they do not subsume those principles and are not determinative in themselves. To hold otherwise would render § 6 superfluous.

Thus, our recognition that Brazil's interest, based only on § 188 contacts, is greater than

7

the United States' cannot be the end of our inquiry or determinative of its conclusion. The United States also has some interest in this transaction and the parties, being FedEx's domicile. *See id*. § 188(2)(e). Which state is most interested under § 188 is a different question from which state has the more significant relationship with the parties and the contract for purposes of § 197.

In this case, even taking account of Brazil's superior § 188 contacts, two of the § 6 factors emerge as determinative of United States venue: (1) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue in dispute, § 6(2)(c), and (2) protection of the parties' justified expectations, § 6(2)(d). Once Lilly – for whatever reason – asked a United States court to consider its contract, it invited application of the well-settled "presumption in favor of applying that law tending toward the validation of the alleged contract." *Kossick v. United Fruit Co.*, 365 U.S. 731, 741 (1961); *see also Pritchard v. Norton*, 106 U.S. 124, 137 (1882) ("The parties cannot be presumed to have contemplated a law which would defeat their engagements." (internal quotation marks omitted)). This presumption is consistent with the general rule of contract construction that "presumes the legality and enforceability of contracts." *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977); *see Nat'l Labor Relations Bd. v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO*, 353 F.3d 197, 202 (2d Cir. 2003) (acknowledging the presumption that an ambiguous contract should not be interpreted so that it is rendered invalid and unenforceable); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *cf. Kipin Indus., Inc., v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 495-96 (6th Cir. 1999) (observing that

8

under the Restatement, even an explicit choice of law provision is to be considered a mistake if the chosen law would invalidate an express portion of the contract).

The paramount importance of enforcing freely undertaken contractual obligations, especially in commercial litigation involving sophisticated parties, was obvious to the District Court and is obvious to us. The Restatement expressly provides that the justified expectation of enforceability generally predominates over other factors tending to point to the application of a foreign law inconsistent with such expectation. Comment b of § 188 of the Restatement provides:

> Parties entering a contract will expect at the very least, *subject perhaps to rare exceptions*, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied.

*Id.* § 188, cmt. b (emphasis added). Likewise, the comments to § 197 note that the default rule favoring the local law of the state of dispatch may not apply when the contract would be invalid under such law "but valid under the local law of another state with a close relationship to the transaction and the parties."[3] *Id.* § 197 cmt. c. In such a situation, the default shifts to favor the validating law "unless the value of protecting the expectations of the parties by upholding the

[3]The dissent suggests that the United States does not have a "significant" or "close" relationship with the contract for purposes of § 197. *See* Dissenting Op. at 8, 10. As we have already noted, the United States is the domicile of FedEx. Moreover, the § 197 comments suggest that the very fact that one interested state's laws would render a contract valid, while another's would not, bolsters the "significance" of the first state's relationship to the transaction and the parties. *See* Restatement § 197 cmt. c.

9

contract is outweighed in the particular case by the interest of the state of departure or dispatch in having its invalidating rule applied." *Id*.

Under federal common law, the limitation in the waybill is valid. The "release value" doctrine recognizes the validity of provisions limiting the liability of carriers for lost or damaged cargo. *See Nippon Fire*, 235 F.3d at 59-60 (validating such provisions where they are "set forth in a 'reasonably communicative' form so as to result in a 'fair, open, just and reasonable agreement' between carrier and shipper" and "offer the shipper a possibility of higher recovery by paying the carrier a higher rate"); *accord Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Comm'n*, 712 F.2d 740, 746 (2d Cir. 1983); *Hill Constr. Corp. v. Am. Airlines, Inc.*, 996 F.2d 1315, 1317 (1st Cir. 1993).

We have little difficulty concluding that this case does not present a rare exception and that the parties reasonably expected – or certainly should have expected – that their contract would be enforceable. As we noted, the contract contained not only a loss limitation clause, but offered Lilly the option of securing more insurance if it paid a higher premium – an option Lilly did not avail itself of. Lilly has offered no satisfactory justification for expecting that it would be permitted to finesse this commitment.

Lilly's principal contention is that the District Court erred in attaching a presumption of validity to the contract because it is commonplace in the sphere of international common carriage, including in Brazil, that a carrier who acts with gross negligence will be precluded from relying on a contractual liability limitation. While acknowledging that the contractual limitation provision controls for simple negligence, Lilly, relying on § 6(2)(c) of the Restatement, contends

10

that under the laws of Brazil – the other interested state – the limitation provision is void if FedEx acted with willful misconduct or gross negligence.

Lilly has not convinced us that this contention is correct. Lilly relies on a declaration by Brazilian transportation attorney, Paulo de C. Machado, which Lilly submitted in support of its motion for summary judgement. The declaration initially states that "there is NO legal limitation for carriers in road or railroad transportation." As the sole authority for this proposition, the declaration refers to a Brazilian legislative decree which states that "[t]he railroads are responsible for the total or partial loss, pilferage or damage to the merchandises which they received to transport." According to the declaration, this decree has been applied to transportation by truck. With regards to air transportation, both domestic and international, the declaration asserts that "[t]here is limitation of liability only in air carriage, but it does not apply in case of gross negligence." The following Brazilian law provisions are offered as support for this proposition:

Decree No. 20.704/31, art. 25:
1) The carrier has no right to benefit of the dispositions of the [Warsaw] Convention, which exclude or limit their liability, if the loss is consequence of their malice or of their fault, when according to the law of the court analyzing the case fault is equivalent to malice.

Law No. 7.565/86:
The limits of the indemnity, stated in this Chapter, are not applicable if it is proved that the loss resulted from malice or gross fault of the carrier or of their employees.

Lilly's statements of Brazilian law prove too much. Brazilian law does not provide for any specific limitations on liability for losses occurring during truck carriage. Limitations of

11

liability, under Brazilian law, are only expressly allowed in air carriage and are then subject to an exception for gross negligence. Given no real support in the record for Lilly's contention that Brazil's gross negligence exception even applies during ground carriage – let alone support for the proposition that Brazil's interest in applying such an exception outweighs the value of upholding the contract, *cf.* Restatement § 197 cmt. c. – we are hard-pressed to see how the parties could have had a justified expectation to that effect.[4] In the absence of such support, we are comfortable concluding that our own firmly grounded policy of enforcing contractual obligations assumed by sophisticated commercial entities should apply.[5]

---

[4]We also disagree with the dissent that we are required to take Machado's articulartion of various propositions of Brazilian law at face value, *see* Dissenting Op. at 15-17, when Machado then refers to and quotes specific provisions of Brazilian law that do not support those representations. Unlike *Curley v. AMR Corp.*, 153 F.3d at 12, we do not find that Lilly's submissions of Brazilian law were insufficient to conduct a proper choice of law analysis; instead, we find that Lilly's representations contradict the actual provisions of Brazilian law that govern.

[5]The dissent argues that a State's strong policy interest predominates over the justified expectations of the parties that a contractual damages provision is valid. *See* Dissenting Op. at 11-13. While it is possible that evidence of a strong policy interest may overcome the presumption of enforceability of a contract provision, no such Brazilian policy has been identified.

Confoundedly, the dissent argues that we need not concern ourselves with what Brazilian law is, in determining Brazil's policy interests. *See* Dissenting Op. at 14. It seems obvious to us that whether or not Brazilian law has an invalidating rule governing ground transport is particularly relevant to whether Brazil, in fact, has a strong policy interest in this issue that is owed deference. The Restatement acknowledges that "[t]he content of the relevant local rule of a state may be significant in determining whether this state is the state with the dominant interest." Restatement (Second) Conflict of Laws § 6 cmt. f. In this case, the provisions of Brazilian law submitted by Lilly reflect policies that are either completely at odds with what the parties contracted for (i.e., would never allow a provision that limits ground carriage damages) or that have no relationship to the issue before us (i.e., would only apply to air carriage losses and not ground carriage).

12

## III. CONCLUSION

The judgment of the District Court is affirmed.

#06-0530

Eli Lilly v. Fed Ex

MESKILL, Circuit Judge, dissenting:

I agree that we should apply the federal common law's choice of law rules to determine whether this contract is governed by Brazilian law or federal common law and that we may look to the Restatement (Second) of Conflict of Laws (1971) (the Restatement) for guidance. However, I disagree with the majority's conclusion that under federal common law and the Restatement the United States has a greater interest in this litigation than does Brazil. I believe that Brazil's strong interest in regulating commerce within its borders trumps any interest of the United States in enforcing this contract. Therefore, I respectfully dissent.

I.   The Restatement (Second) of Conflict of Laws

The Restatement has four provisions that offer guidance as to how we should resolve this conflict between Brazilian law and federal common law. See Restatement §§ 6, 188, 197 and 207. My analysis begins with the Restatement provisions that specifically apply to conflicts in contract law because "a specific statute controls over a general one." Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961); see also United

14

*States* v. *Torres-Echavarria*, 129 F.3d 692, 699-700 n.3 (2d Cir. 1997) ("The operative principle of statutory construction is that a specific provision takes precedence over a more general provision.").

A.   Section 197 of the Restatement Sets Brazil as the Default Jurisdiction Because the Goods Were Dispatched From Brazil

The FedEx Air Waybill called for the transportation of Lilly's goods from Brazil to Japan. The Waybill contained no choice of law provision. Under Restatement § 197 contracts for the transportation of goods are governed "by the local law of the state from which . . . the goods are dispatched." Section 197 sets Brazil as the default jurisdiction because the state of dispatch "will naturally loom large in the minds of the parties" and it "has a natural interest in the contract of transportation and in many instances has a greater interest in the contract than the state of destination, if for no other reason than that there can be no absolute certainty at the time of the departure that . . . the goods will reach the latter state." Restatement § 197 cmt. b.

However, while § 197 sets Brazil as the default jurisdiction, it also provides for the possibility that another state may have "a more significant relationship under the principles stated in § 6 to the contract and to the parties."

15

Furthermore, "[o]n occasion" the law of a state other than the state of dispatch might apply. Restatement § 197 cmt. c. This may occur if the contract is invalid under the law of the state of dispatch but valid under the law of a state with "a close relationship to the transaction and the parties." Id. Thus, Brazil's laws will govern this contract unless the United States has either a "more significant relationship" to the contract and to the parties than does Brazil, Restatement § 197 (emphasis added), or the contract is invalid under Brazilian law and the United States has a "close relationship" to the contract and to the parties, Restatement § 197 cmt. c (emphasis added). Leaving aside for the moment the issue of whether the FedEx Air Waybill is valid under Brazilian law, I turn to Restatement § 188 for guidance in determining whether the United States has a significant or close relationship to the contract or to the parties.

   B.   Under § 188 of the Restatement Brazil Has the Most Substantial Contacts With the Contract and With the Parties

Section 188 of the Restatement is designed to help courts resolve a conflict of laws that involves "an issue in contract." Restatement § 188(1). To determine which state has "the most significant relationship to the transaction and the parties," id., the court evaluates the following five contacts:

16

        (a) the place of contracting,
        (b) the place of negotiation of the contract,
        (c) the place of performance,
        (d) the location of the subject matter of the contract,
        and
        (e) the domicil, residence, nationality, place of
        incorporation and place of business of the parties.

Id. § 188(2)(a)-(e).  Once these contacts are known, the court takes them "into account" by "applying the[m to] the principles of § 6."  Id. at § 188(2).  The § 6 principles are those general considerations that "underlie all rules of choice of law," id. at § 188(1) cmt. b.:

        (a) the needs of the interstate and international
        systems,
        (b) the relevant policies of the forum,
        (c) the relevant policies of other interested states
        and the relative interests of those states in the
        determination of the particular issue,
        (d) the protection of justified expectations,
        (e) the basic policies underlying the particular field
        of law,
        (f) certainty, predictability and uniformity of result,
        and
        (g) ease in the determination and application of the
        law to be applied.

Id. at § 6(1).  Thus, to determine whether the United States has a "significant" or "close" relationship to the contract and to the parties, the Court must first evaluate each state's § 188(2) contacts with the FedEx Air Waybill.

        1.   The Place of Negotiation Was Brazil

        The FedEx Air Waybill was negotiated between FedEx and Lilly's Brazilian freight forwarder Nippon Express do Brasil,

17

Ltda (Nippon Express) in Brazil.  The contract between FedEx and Jumbo Jet Transportes Internacionais, Ltda (Jumbo Jet), and the contract between Lilly and Nippon Express, also were negotiated in Brazil.

2.  The Place of Contracting Was Brazil

The FedEx Air Waybill was issued to Nippon Express in Brazil by the FedEx office in São Paolo.  In addition, the following contracts were executed in Brazil: (1) Lilly's contract with Nippon Express, (2) Nippon Express' subcontract with FedEx, and (3) FedEx's subcontract with Jumbo Jet.

3.  Performance Under the Contract Occurred Only In Brazil

Lilly contracted with Nippon Express to transport the fourteen drums of Cephalexin from Lilly's factory in Cosmopolis, São Paolo, Brazil to Lilly's customer in Iwate, Japan.  Nippon Express picked up the pharmaceuticals from Lilly's factory in São Paolo and transported them to the Nippon Express freight forwarding facility at Cumbica Airport in Guarulhos, Brazil. Nippon Express then subcontracted with FedEx to deliver the shipment to Narita International Airport in Chiba, Japan.

FedEx picked up and accepted the pharmaceutical cargo at the Nippon Express freight forwarding facility in Guarulhos, Brazil and subcontracted with Jumbo Jet to transport the cargo locally from Guarulhos to an airport FedEx uses for international

18

shipments located in Viracopos, Brazil. While the goods were on a Jumbo Jet truck on route to Viracopos the truck was hijacked and the pharmaceuticals were stolen. Had the pharmaceuticals made it to Viracopos, FedEx would have transported them to Chiba, Japan via São Paolo and Memphis, Tennessee. However, because the Jumbo Jet truck was hijacked the only performance that ever took place under the contract occurred in Brazil.

Admittedly, performance under the contract also would have taken place in the United States had the shipment not been hijacked.[1] However, the goods were only to enter the United States briefly so that FedEx could route them through its hub in Memphis before sending them on to Japan. The United States was neither the final destination state nor the state of dispatch. The cargo's planned brief stopover in Memphis is an insignificant contact when compared with the performance that actually took place in Brazil, especially considering that the performance that is the subject of this contract dispute -- the ground transportation between Guarulhos to the airport located in

---

[1] Restatement § 188(3) provides that when "the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied." In this case, the place of negotiating was Brazil but the place of performance was both Brazil and the United States. Nevertheless, because what little performance occurred was in Brazil, § 188(3) serves to highlight Brazil's significant interest in the contract.

Viracopos -- occurred only in Brazil.  Therefore, while the contract called for performance in both the United States and Brazil, because the shipment originated in Brazil, the little performance that occurred under the contract occurred in Brazil. The goods never left Brazil.  Thus the § 188(2)(c) contact weighs heavily in favor of Brazil.

>            4.    The Subject Matter of the Contract Was Located in Brazil

The pharmaceutical cargo was in Brazil at the time of contracting and FedEx never transported the cargo out of Brazil.

>            5.    The Parties Involved Are Either Brazilian Companies Or Companies That Regularly Conduct Business in Brazil

Lilly, Nippon Express and Jumbo Jet are all Brazilian companies domiciled in Brazil.  FedEx is not a Brazilian company. Nevertheless, FedEx regularly conducts business in Brazil and the Air Waybill here was issued by the FedEx office in São Paolo.

>      C.    When the § 188(2) Factors Are Taken Into Account and Applied to the § 6 Principles Brazil Emerges as the State With the Most Significant Relationship to the Transaction and to the Parties

"The states which are most likely to be interested [in the contract] are those which have one or more of the [§ 188(2)] contacts."  Restatement § 188 cmt. e.  Brazil has the most substantial § 188(2) contacts with the FedEx Air Waybill and with the parties.  While the majority admits that Brazil's § 188(2)

20

contacts are "important ones," they never proceed to the next step and take those contacts into account and apply them to the principles of § 6. Instead, the majority concludes that two of the § 6 principles -- (1) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, and (2) the justified expectations of the parties -- "emerge as determinative" in favor of applying federal common law.

The majority concludes that federal common law applies over Brazilian law without pointing to a single § 188(2) contact that the United States has with either the FedEx Air Waybill or with the parties. In addition, the majority never acknowledges that under § 197 Brazil is the default jurisdiction whose laws govern this contract unless the United States has a "significant" or "close" relationship to the contract. In my view, §§ 188 and 197 are specific provisions addressing conflicts in contract law that should take precedence over the more general § 6 principles. See Bulova, 365 U.S. at 758. Therefore, I would follow the Restatement and take each states' § 188(2) contacts into account and apply them to the § 6 principles. When this is done, Brazil emerges as the only state with a "significant" or "close" relationship to the contract and to the parties.

I agree with the majority that the most important § 6

principles implicated by this conflict of laws are (1) the relevant policies of the forum, (2) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue, and (3) the protection of justified expectations.  See Restatement § 6(b),(c) & (d).  I also agree with the majority's conclusion that under our federal common law choice of law rules there is "some presumption in favor of applying that law tending toward the validation of [an] alleged contract."  Kossick v. United Fruit Co., 365 U.S. 731, 741 (1961).

The presumption in favor of applying the law that tends to validate a contract is important where the alternative is no contract at all.  This was the conflict of laws choice presented in Kossick, but it is not the conflict of laws choice presented here.  In this case application of Brazilian law may invalidate one provision in the FedEx Air Waybill and then only under limited circumstances.  However, in Kossick the Court was faced with a much more drastic choice: (1) apply the New York Statute of Frauds, which would render the alleged oral contract wholly invalid, or (2) apply federal maritime law, which generally upholds oral contracts.  365 U.S. at 733-34.  Even though the application of New York law would have completely invalidated the contract, the Kossick Court did not treat that factor as

22

dispositive, but instead analyzed whether the contract was "sufficiently related to peculiarly maritime concerns" and whether the contract "though maritime" was "maritime and local." Id. at 738 (internal quotation marks omitted).

The Kossick Court never treated the presumption in favor of applying the law that would validate the contract as dispositive, and under circumstances that presented a much more compelling case for adherence to the presumption than those presently before the Court.  Instead, the presumption was just one of "several considerations" the Kossick Court discussed in its choice of law analysis.  Id. at 741.[2]  I find no support in Kossick for the majority's conclusion that we must ignore all other traditional choice of law factors and instead apply federal common law because it validates this contract, particularly when it is Brazil that has the dominant interest in this litigation and applying Brazilian law could only affect the amount of damages in a limited situation.  Even if the presumption in favor of applying the law that tends to validate contracts applies here, with all of the § 188(2) contacts, Brazil has easily rebutted the presumption.

_____

[2] The other considerations were whether the contract was "essentially maritime [in] character," whether the contract could have been made "anywhere in the world" and whether its validity "should be judged by one law wherever it was made," and whether New York had a significant interest in the contract.  Id.

23

Furthermore, while the federal common law's presumption in favor of applying the law that tends to validate contracts might mean that the United States has a general interest in validating contracts, the United States still does not have a "significant" or "close" relationship with this contract. Therefore, under § 197 Brazil remains as the default jurisdiction whose laws govern this contract of transportation regardless of whether the liability limitation is valid under Brazilian law. The Restatement does not elevate the forum state's interests above any other state's, nor should we.[3]

I also disagree with the majority's conclusion that the protection of the justified expectations of the parties mandates application of federal common law. First, because choice of law is not expressed in the Waybill the justified expectations of the parties, like the other § 6 principles, must be analyzed in accordance with each state's § 188 contacts. The United States does not have any significant § 188 contacts with this contract. However, Brazil served as the place of negotiation and execution of the contract, the majority of the companies are domiciled in Brazil, and the contract called for the transportation of goods

[3] The United States' interest in enforcing contracts will arise in any choice of law contract case litigated in its courts, even when the only contact it has with the contract is that it is the state where the lawsuit was brought.

24

located in Brazil out of Brazil.  Under these circumstances, I believe that the parties would be wholly justified in expecting that their contract was governed by Brazilian law.

Second, there has been no allegation by either party that the contract would be rendered completely invalid under Brazilian law.  We are only concerned with the validity of the limitation of liability provision and then only under certain conditions.  I agree with the Restatement commentary that while "the expectations of at least one of the parties would presumably be disappointed if the [damages] provision is found to be invalid[,] [o]n the other hand, a rule declaring such a provision invalid is likely to represent a strongly-felt policy which the forum would be hesitant to override if the state with the invalidating rule was the state with the dominant interest in the issue to be decided."  Restatement § 207 cmt. c.[4]  Regardless of

---

[4] Section 207 of the Restatement addresses conflict of laws involving damages provisions in breach of contract claims.  While the text of § 207 provides that "[t]he measure of recovery for a breach of contract is determined by the local law of the state selected by application of the rules of §§ 187-188," the commentary minimizes the importance the justified expectations of the parties have in cases such as this, where the only conflict involves the measure of recovery:

> [Q]uestions involving the measure of recovery for breach of contract will be determined in accordance with the law selected by application of the rule of § 188.  This rule in turn calls for the application of the choice-of-law principles stated in § 6, of which one . . . is the protection of the justified

what the parties expectations were, Brazil is the state with the dominant interest in this litigation and by applying federal common law we are overriding Brazil's "strongly-felt policy" regarding the validity of the damages provision.

Third, while I agree with the majority that in many cases "the protection of the justified expectations of the parties is of considerable importance in contracts," Restatement

expectations of the parties. This principle, however, has little role to play with respect to the measure of damages. In the absence of a provision in the contract dealing explicitly with the question of damages, it is improbable that the parties gave thought before entering the contract to what the measure of damages would be in the event of breach. Hence, the expectations of the parties are unlikely to be disappointed by application of the rule of one state rather than of the rule of another state. In such circumstances, the forum, in determining which is the state of the applicable law with respect to the measure of damages, will usually give primary weight to the choice-of-law principle, also mentioned in § 6, which seeks the effectuation of the relevant policies of the state with the dominant interest in the issue to be determined.

The situation is essentially the same where the issue involves the validity of a provision in the contract dealing with the measure of damages. Here the expectations of at least one of the parties would presumably be disappointed if the provision is found to be invalid. On the other hand, a rule declaring such a provision invalid is likely to represent a strongly-felt policy which the forum would be hesitant to override if the state with the invalidating rule was the state with the dominant interest in the issue to be decided.

Id. at § 207 cmt. c.

26

§ 188 cmt. b, I do not agree that to protect the justified expectations of the parties we should enforce blindly the contract as written where no choice of law is expressed and that choice might determine the damages allowed. If the majority's interpretation of the Restatement is correct, then §§ 188, 197 and 207 serve no purpose, and we need never consider whether the United States or any other interested state has any contacts with a contract. I do not believe that the presumption in favor of applying the law that tends toward the validation of the contract has supplanted the traditional choice of law analysis embodied in the Restatement.

Of course, where two states have significant interests in the contract the common law presumption in favor of applying the law of the state that tends to validate the contract might prove dispositive. However, this is not such a case. Brazil's interest in regulating commerce within its own borders heavily outweighs any interest the United States has in enforcing this contract. The Supreme Court has instructed courts to "construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 164 (2004); see also Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of congress ought never to be construed to violate the

law of nations if any other possible construction remains.").
Here we are dealing only with a judicially created common law
presumption and not an act of Congress, yet the majority somehow
concludes that this presumption is an interest that trumps
Brazil's sovereign authority.

II.  Lilly's Evidence of Brazilian Law

Finally, the majority faults Lilly for failing to
provide sufficient evidence that Brazilian law does not allow
common carriers to limit their damages when they are grossly
negligent.  However, the issue before the Court is whether
Brazilian law applies -- not what Brazilian law is.  I do not see
why we need to consider the particulars of Brazilian law at this
stage of the proceedings.

But even assuming arguendo that the content of
Brazilian law should play a role in resolving this conflict of
laws, Lilly has supplied sufficient evidence that Brazil treats
limitation of liability provisions differently than does the
United States.  The majority dismisses the Machado declaration as
offering "no real support" for Lilly's assertion that Brazilian
law does not allow FedEx to limit its liability for acts of gross
negligence.  However, the Machado declaration plainly states that
"a common carrier is not entitled to limit its liability if found
to be grossly negligent in the care of the cargo while said cargo

28

was in its custody, control and possession or in the custody, control and possession of its duly appointed agent or sub-contractor."  Under the Federal Rules of Civil Procedure, district courts are allowed to make determinations regarding foreign law by considering "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  We have "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations" because "such issues can be expected to come to the federal courts with increasing frequency as the global economy expands and cross-border transactions increase."  Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998).  Nevertheless, the majority finds the Machado declaration insufficient despite the Federal Rules of Civil Procedure and our case law that would allow the district court to rely on it.  This is an odd conclusion because FedEx never challenged Lilly's characterization of Brazilian law.

In the district court proceedings FedEx decided not to submit proof of Brazilian law because "such is premature at this point," and in its brief to this Court FedEx mistakenly informs us that "the parties did not offer factual proof of the substance of Brazilian law."  However, only FedEx failed to provide proof

of Brazilian law. Lilly's characterization of Brazilian law and the Machado declaration are unchallenged.[5]

I also disagree with the majority's conclusion that Lilly failed to address whether the parties could contract around Brazilian law. The Machado declaration states that "a common carrier is <u>not</u> <u>entitled</u> to limit its liability if found to be grossly negligent." The plain meaning of this sentence is that common carriers in Brazil cannot limit their liability for grossly negligent acts even if they try.

For the foregoing reasons, I respectfully dissent from the majority opinion. I would vacate the district court's judgment and remand this case to allow the district court to determine whether the limitation of liability provision in the FedEx Air Waybill is valid and enforceable under Brazilian law.

---

[5] FedEx even appears to concede that Brazilian law would render the limitation provision invalid: "Eli Lilly seeks to apply Brazilian law, which would not enforce the limitation if Eli Lilly can prove that FedEx acted with gross negligence or willful misconduct."

30