**Nana Osei BONSU, Petitioner**

v.

**Eric HOLDER, Respondent.**

**Civil Action No. 3:09–cv–0429 (JCH).**

United States District Court,
D. Connecticut.

Aug. 19, 2009.

Justin Conlon, Law Office of Michael Boyle, North Haven, CT, for Petitioner.

James E. Grimes, Department of Justice, Office of Immigration, Washington, DC, Julie G. Turbert, U.S. Attorney's Office, New Haven, CT, for Respondent.

### RULING RE: PETITIONER'S DERIVATIVE CITIZENSHIP

JANET C. HALL, District Judge.

## I.  INTRODUCTION

Petitioner Nana Bonsu is a native of Ghana. He is before this court as a result of a transfer from the Second Circuit of an appeal of a removal order pursuant to 8 U.S.C. § 1252(b)(5)(B). The sole issue is whether Bonsu has established that he has derivative citizenship of the United States. In order to do so, Bonsu must prove that his paternity has not been established by legitimation.

Both parties filed briefs with the court, as well as a lengthy joint appendix. Fur-

ther, the court heard testimony on July 15, 2009. For the reasons stated below, this court finds that Bonsu's paternity was not legitimated under Ghanaian law. He is, therefore, a U.S. citizen and not removable.

## II. BACKGROUND

In February 2007, removal proceedings were begun against Bonsu. He had been convicted in Connecticut Superior Court on May 30, 1997, of the offenses of sexual assault in the first degree and unlawful restraint. He was sentenced to ten years incarceration.

Throughout his immigration proceedings, Bonsu has claimed derivative citizenship through his mother. In March 2007, the Immigration Judge ("IJ") ruled that Bonsu failed to meet his burden of proof in demonstrating that his paternity was not legitimated. Bonsu filed an appeal with the Board of Immigration Appeals ("BIA"), which appeal was dismissed on August 24, 2007.

On September 20, 2007, Bonsu filed a motion for reconsideration, bringing to the attention of the BIA a July 2007 decision of this court, *Ankrah v. Gonzales*, No. 3:06CV0554(PCD), 2007 WL 2388743, 2007 U.S. Dist. LEXIS 63970 (D.Conn. July 21, 2007). That case, which was also transferred to the district court pursuant to section 1252(b)(5)(B), addressed the same issue that is before this court: what is the standard for legitimation of paternity in Ghana. In *Ankrah*, the district court had ruled that the petitioner's interpretation of Ghanaian legitimation law was correct. *Id.* at *7–*8, 2007 U.S. Dist. LEXIS 63970 at *23–*24. In light of that ruling, the BIA granted the motion to reconsider and remanded the case to the IJ for further proceedings.

On January 9, 2008, the IJ issued a decision again finding that Bonsu did not have derivative citizenship. The IJ stated that he was not precedentially bound by the decision of a district court and that he disagreed with the reasoning of the *Ankrah* court. Bonsu appealed this decision, but his appeal was dismissed by the BIA on July 15, 2008. Bonsu then filed a petition for review with the Second Circuit. On March 11, 2009, the Second Circuit issued a Stipulation and Order transferring Bonsu's case to this court, for it to address the issue of whether Bonsu was legitimated under Ghanaian law. *See* Stipulation and Order of Transfer (Doc. No. 1).

## III. LEGAL STANDARDS

### A. *Standard of Review*

This court has jurisdiction over this matter pursuant to section 1252(b)(5)(B) of title 8 of the U.S.Code, which states that the case shall be transferred to the district court "for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court. . . ." 8 U.S.C. § 1252(b)(5)(B). The parties agree that this court's review of Bonsu's claim of derivative citizenship is *de novo*. *See* Pet.'s Br. at 13 (Doc. No. 8); Resp.'s Br. at 4 (Doc. No. 16).

### B. *Burden of Proof*

■ In general, the government bears the burden of establishing the removability of an alien. *See* 8 U.S.C. § 1229a(c)(3)(A). However, when the disputed issue is derivative citizenship, if the government provides evidence of a foreign birth, a rebuttable presumption of alienage is created, and the burden shifts to the petitioner to prove his citizenship by a preponderance of the evidence. *See Scales v. INS*, 232 F.3d 1159, 1163 (9th Cir.2000);[1] *see also In re*

---

1. The Second Circuit has applied this burden-shifting framework in an unreported case.

*See Fabregas v. INS*, 107 Fed.Appx. 249, 250 (2d Cir.2004) (citing *U.S. ex rel. Barilla v. Uhl*,

*Tijerina–Villarreal,* 13 I. & N. Dec. 327, 330 (B.I.A.1969). The parties agree that respondent has provided evidence of Bonsu's foreign birth and that the burden therefore lies with the petitioner. *See* Pet.'s Br. at 14; Resp.'s Br. at 4–5.

### C. *Proof of Foreign Law*

■ The court must consider whether paternity has been established based on the law of the child's native country. *See Gorsira v. Loy,* 357 F.Supp.2d 453, 459 (D.Conn.2005) (Underhill, J.). Because Bonsu's claim for derivative citizenship rests on whether he was legitimated under Ghanaian law, he must prove the Ghanaian standard for legitimation by a preponderance in order to prevail. In determining the law of Ghana, a district court may consider "any relevant material or source," regardless of whether it was introduced by a party or whether it is admissible under the Federal Rules of Evidence. Fed. R.Civ.P. 44.1. When a party's claim rests on the existence or application of foreign law, the Second Circuit has dismissed those claims if that party failed to provide evidence of the contents of the foreign law. *See, e.g., Walton v. Arabian American Oil Co.,* 233 F.2d 541, 545 (2d Cir.1956) (holding complaint properly dismissed when plaintiff failed to provide evidence of Saudi Arabian law essential to claim); *Esso Standard Oil S.A. v. S.S. Gasbras Sul,* 387 F.2d 573, 581 (2d Cir.1967) (dismissing claims after finding plaintiff failed to prove strict liability existed under Guatemalan law and therefore failed its burden of proof); *Eli Lilly do Brasil, Ltda. v. Fed. Express Corp.,* 502 F.3d 78, 84 (2d Cir. 2007) (refusing to apply Brazilian law, which would dismiss case, when defendant failed to prove foreign law).

## IV. FINDINGS OF FACT

Nana Osei Bonsu was born in Kumasi, Ghana on July 20, 1975, to Mercy Mensah. His biological father is Osei Tutu Bonsu, but petitioner argues that he has never had any relationship or contact with his father.[2] Ms. Mensah immigrated to the United States in 1978 and became a naturalized citizen in 1989. Nana Bonsu remained in Ghana, living with Ms. Mensah's family in Kumasi and later with David Addy's family in Accra, until he was granted an immigrant visa to enter the United States on April 16, 1991. Bonsu, who was 17 when he arrived in this country, then went to live with his mother in Hartford, Connecticut.

On July 15, 2009, this court held an evidentiary hearing. Four witnesses testified: Nana Osei Bonsu (the petitioner), Clara Bonsu (his sister), Mercy Mensah (his mother), and David Addy (his mother's long-time boyfriend).[3] All of the witnesses testified that Bonsu had never had any kind of a relationship with his biological father, Osei Tutu Bonsu.

Nana Bonsu lived with his maternal grandmother for most of his childhood. He never saw or spoke with his biological father, despite living in the same city. The first time that Nana Bonsu ever spoke to his father was in 2005, when Nana called him after being released from custody. Osei Bonsu told Nana Bonsu that Nana was not Osei's son and disconnected the call.

---

27 F.Supp. 746, 747 (S.D.N.Y.1939), *aff'd per curiam,* 108 F.2d 1021 (2d Cir.1940)).

**2.** Bonsu testified to a brief telephone conversation with his father in 2005. *See infra* p. 276.

**3.** The court is well aware of the interests of the witnesses, especially the petitioner and his mother, but credits their testimony based on the court's assessment of them as they testified and all relevant evidence.

Clara Bonsu, who is the petitioner's full sister, grew up in her paternal grandmother's house and, unlike her brother, she did have a relationship with their father, Osei Bonsu. As a child, she would visit Nana at their maternal grandmother's house, but he was never allowed to visit her. Clara was not supposed to have contact with Nana as a child, and none of her father's family has ever met Nana. When she was older, she lived with her father in Accra. After learning that Nana was also living in Accra, Clara got into an argument with her father, who refused to let her visit Nana and told her that "he was not [her] brother."

Mercy Mensah, Clara and Nana's mother, is at least 20 years younger than their biological father, Osei Bonsu. She lived with Osei for a few months during her pregnancy with Clara, but then she moved back in with her mother. Osei continued to visit her during the rest of her pregnancy with Clara and after Clara was born. When she got pregnant with Nana, Ms. Mensah was still living with her mother. Osei continued to visit her during her pregnancy with Nana, and he would bring over gifts of food for Clara and small amounts of money. However, this money was not enough to support Ms. Mensah. Osei never accompanied her to the doctor while she was pregnant with Nana and only visited her once after Nana was born. Ms. Mensah heard the reason that Osei refused to acknowledge Nana as his son was because Osei thought that Nana had "dark skin" and therefore was not his child. Osei has never provided any kind of child support for Nana.

It is the tradition for the father's family to host a naming ceremony for newborn children. Osei's family held a naming ceremony for Clara, who was named after Osei's mother. However, Nana never had a naming ceremony because Osei's family refused to host it.

David Addy, who is Ms. Mensah's long-time boyfriend, is a naturalized U.S. citizen and has known Nana since he was a teenager. He met Ms. Mensah in the United States. They became friends while working for the same employer in Oklahoma City. During this time, Ms. Mensah raised with Mr. Addy her concerns about the schooling that Nana was getting. She wanted to send Nana to school in Accra. Because of their friendship, Mr. Addy agreed to arrange for Nana to live with Mr. Addy's family in Accra while Nana attended school. Mr. Addy has never discussed Nana's biological father with him, but Ms. Mensah has told Mr. Addy that the father would not take responsibility for Nana. Mr. Addy has two children with Ms. Mensah and, although Mr. Addy and Ms. Mensah are from different tribes, their children were named in accordance with the traditions of his tribe.

Finally, all of the witnesses testified about the process of obtaining a birth certificate in Ghana. When Clara went to get a new copy of her birth certificate in 1990, before she came to the United States, she did not have to show any documentation; she just paid a fee. She went to the Registrar's Office in Accra and obtained a copy without any problem. When Mr. Addy went to the Registrar to register his son's birth, the office was very disorganized, nothing was computerized, and he did not need to provide any documentation. It was his impression that a person could say anything and obtain a birth certificate.

Ms. Mensah attempted to register Nana's birth in 1984. At that time, she asked the Registrar if she could leave the father's name blank. They told her this was not allowed in Ghana, so she gave them Osei Bonsu's name. Because she had to return to the United States and was unable to complete the process, however,

she did not obtain a birth certificate at that time. In 1989, she again went to the Registrar. Osei Bonsu was not with her when she went to the Registrar and has never requested a birth certificate for Nana Bonsu. Ms. Mensah did not know why Osei Bonsu's name was listed as the "informant" on Nana's 1989 birth certificate. The office was very disorganized, and Ms. Mensah did not need to provide any documentation when she requested Nana's birth certificate.

The testimony of the witnesses is supported by the documents. Two certified copies of entry in the Register of Births for Nana Bonsu, one from 1989 and one from 2006, were introduced into evidence. *See* Resp.'s Exhibits 101, 102. The 2006 "Certified Copy of Entry in Register of Births" looks significantly different from the 1989 "Certified True Copy of Entry in Register of Births," suggesting that no original copy is on file since a photocopy of the original would have reproduced the 1989 certificate exactly. *See id.* Additionally, the 1989 certificate is a copy of Entry No. 1478 in the Register of Births, while the 2006 certificate is a copy of Entry No. 211 in the Register of Births, which suggests that there is also no master copy of the register itself. *See id.* In light of the testimony and the documents, the court finds that Bonsu's birth certificates are not reliable evidence.

## V. CONCLUSIONS OF LAW

Bonsu's claim of derivative citizenship is governed by the former 8 U.S.C. § 1432 (repealed 2000),[4] which provides:

(a) A child born outside of the United States of alien parents ... becomes a citizen of the United States upon fulfillment of the following conditions:
...

(3) ... [T]he naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is unmarried and under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residents at the time of the naturalization of ... the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

It is undisputed that Bonsu was under eighteen when his mother became naturalized, and that he resided lawfully in the United States after her naturalization but before he turned eighteen. *See* Resp.'s Br. at 6. He thus meets the requirements of subsections (a)(4) and (a)(5). The sole dispute in this case is whether Bonsu's paternity has not been established by legitimation under the laws of Ghana, as is required by subsection (a)(3).

Bonsu argues that a child born out of wedlock is only legitimated under Ghanaian law if the father cares for the mother during her pregnancy and names the child in accordance with his tribal naming rituals. *See* Pet.'s Br. at 14. In support of this proposition, Bonsu offers two Ghanaian High Court opinions. In *Republic v. Mallet,* the High Court states:

[I]t is generally accepted principle of customary law that a child may be legitimate child of the father, even though the said father never married the mother, depending on whether the putative fa-

**4.** Although Congress repealed section 1432 in 2000, it still applies to Bonsu's claim because it was "in effect when [he] [allegedly] fulfilled the last requirement of derivative citizenship." *See Lewis v. Gonzales,* 481 F.3d 125, 126 n. 1 (2d Cir.2007).

ther cared for the mother during the pregnancy, acknowledged and named the child in accordance with the custom applicable to the putative father. *See* Joint Appendix ("JA") at 116 (Docs. 9–13).

Although the *Mallet* court does not go so far as to adopt this "generally accepted principle" as the only Ghanaian standard for legitimation, the case does provide clear evidence that Bonsu's test is one of the methods available to determine legitimacy in Ghana. The *Mallet* court did not decide the issue of legitimacy because there was not enough evidence before the court. *See* JA at 116. However, even though the court noted an uncertainty about what "relevant component" of the law ("the common law, a statute law, or the customary law") should apply, it stated that it was "more likely" that the customary law would apply in the case it was facing—the legitimacy of a child born out of wedlock. *See* JA at 115. This strongly suggests that the High Court of Ghana, if faced with the question of Bonsu's legitimacy, would apply this test.

Additionally, the *Mallet* Court, when discussing the standards for legitimation, did not address the Registration of Births and Deaths Act ("RBDA"), which the government has argued provides another avenue for legitimation. The RBDA was enacted in 1965 and amended in 1968. *Mallet* was decided in 1974. That the High Court ignored the RBDA when discussing methods of legitimation strongly suggests that that statute does not provide a method for legitimation.

The second Ghanaian High Court ruling, *Graham v. Graham,* is not directly on point. The case states that, under a customary law marriage (which allows polygamy), a child is legitimated when the father "acknowledge[s] paternity." *See* JA at 121. The *Graham* court also states that, if a father is married under statutory law and has a child out of wedlock, the child cannot be legitimated. *See* JA at 122. The holding does not address Bonsu's situation: his father was not married at the time of his birth.[5]

Bonsu also urges this court to look to *Ankrah,* a decision by another court in this district on similar facts with a nearly identical record. In that case, the court determined that the process laid out in *Mallet* was the standard for legitimation in Ghana, and the petitioner was therefore not removable. *See Ankrah,* 2007 WL 2388743 at *10, 2007 U.S. Dist. LEXIS 63970 at *30–*31. In making this determination, the district court relied on a finding, made earlier in the procedural history of that case by a three-member panel of the BIA,[6] that the petitioner had "met his burden of proof in establishing the manner in which paternity can be established by legitimation for children born out of wedlock in Ghana." *See Ankrah,* 2007 WL 2388743 at *4, *7, 2007 U.S. Dist. LEXIS 63970 at *11, *22–*23.

Additionally, this court located[7] an article from *The International Lawyer,* a quarterly publication of the American Bar Association, addressing succession laws in Ghana. This article discussed a 1959 in-

5. Ms. Mensah and Osei Tutu Bonsu were never married, and there is no evidence in the record that Osei Bonsu was ever married to another woman

6. The Second Circuit does not give deference to unpublished decisions of the BIA. *See Nguyen v. Chertoff,* 501 F.3d 107, 111 (2d Cir. 2007). The decision of the three-member

panel of the BIA in *Ankrah* is unpublished. *See In re Ankrah,* 2006 WL 448305 (B.I.A. Jan. 26, 2006).

7. Federal Rule of Civil Procedure 44.1 provides that the court, "in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party...."

heritance case in which the intestator had cohabitated with a woman and had ten children with her, naming them in accordance with his tribal customs. The article states:

> As a general principle of law accepted among Ghanaian tribes, a child may be legitimate even though the father never married the mother as required by law, depending on the accepted custom whether the putative father acknowledged paternity, named the child and took care of the pregnant woman until delivery. Ernest K. Bankas, *Problems of Intestate Succession and the Conflict of Laws in Ghana*, 26 INT'L LAW. 433 (1992).

This statement of the law, in an established publication, is consistent with the law as stated in *Mallet* and provides further support for Bonsu's argument.

Finally, Bonsu introduced two memoranda from a Ghanaian law firm, Logan & Associates. These memoranda state that there are three broad categories for legitimation under Ghanaian law: if a man is civilly married to one woman but has a child with another woman, that child cannot be legitimated; if a couple are married under customary law, a child is regarded as legitimate if the man acknowledges paternity; or if there was never a marriage, then the child is legitimated if the father cared for the mother during pregnancy and named the child in a naming ceremony. *See* JA at 92–93. These memoranda provide still further support for the standards of legitimation laid out by the Ghanaian High Court in *Mallet* and *Graham*.

▮ After examining the entire record, Bonsu has proven by a preponderance that the process set forth in *Mallet* is the law of legitimation that governs his case. Although that case itself is not definitive, there is significant support for Bonsu's argument from a wide range of sources: *Graham*, the memoranda from Logan & Associates, the decision in *Ankrah*, and the *International Lawyer* article. Although none of these alone would be definitive, the weight of the evidence supports Bonsu's position. This court accepts the process set forth in *Mallet* as the method for legitimation of a child born out of wedlock in Ghana.

The government, however, argues that the process set forth in *Mallet* and put forward by Bonsu is not the only method for legitimation for a child born out of wedlock. In particular, the government points to Bonsu's father's name on his birth certificate as proof of his legitimation. In support of its argument, the government references a Library of Congress research memorandum [8] which states that "there is no single law" regarding legitimation of children born out of wedlock and that legitimation is "provided under the Registration of Births and Deaths Act." *See* JA at 419. This memo does not mention *Mallet*, *Graham*, or the standards for legitimation set forth in those cases.

The stated purpose of the RBDA is to "provide for the registration of births, fetal deaths and deaths and to make provision for burial grounds." *See* JA at 424. As an initial matter, the court finds that this statute is meant to create a registration system, not delineate the standards for legitimacy. This is supported by the fact that the Ghanaian High Court failed to address the RBDA as an avenue for legitimation in *Mallet*, as noted above. *See supra* at 279.

---

8. Although petitioner argues that this memorandum is not persuasive authority, *see* Pet.'s Br. At 21, another court in this district has relied on a memorandum from the Library of Congress to determine foreign legitimation law. *See Gorsira v. Loy*, 357 F.Supp.2d 453, 460–62 (D.Conn.2005) (Underhill, J.).

The government argues, however, that section 9 of the RBDA does provide a process for legitimation. *See* Resp.'s Br. at 12–14. This section states that, if the paternity of a child is in doubt, the putative father's name shall not be placed on the birth certificate "except at the joint request of the mother and the person acknowledging himself to be the father," after which the putative father would either sign the birth certificate or make a declaration before the Registrar. *See* JA at 437. The government points to a 1965 article in the *University of Ghana Law Journal,* which says, "In Ghana, it may be said that legitimacy is secured by the acknowledgment of paternity by the father." *See* JA at 449. The government argues that the fact that Osei Bonsu's name is listed twice on Nana Bonsu's 1989 birth certificate copy means that he acknowledged paternity, and therefore Nana Bonsu was legitimated. *See* Resp.'s Br. at 14.

Although *Mallet* does not discuss the RBDA, it briefly addresses the role that acknowledgment of paternity plays in legitimation. The High Court stated that, under customary law, if the parents are not married, the child may be legitimate if the father cared for the mother during her pregnancy, and he "acknowledged and named the child in accordance" with his tribal customs. Therefore, under *Mallet,* which this court has accepted as the statement of the law of Ghana, even if the RBDA provides a method for acknowledgment of paternity in the legitimation context, Osei Bonsu's name on the birth certificate is not enough, by itself, to legitimate Nana Bonsu. There must also be proof of care during pregnancy and a naming ceremony.

Finally, the court does not find section 9—even if it provided a process for legitimation—to be applicable to Bonsu's situation, because that section only applies when paternity is in doubt. Paternity and legitimacy are distinct legal concepts. *Cf. Stone v. Williams,* 970 F.2d 1043, 1055 (2d Cir.1992) ("[The earlier] proceedings did not reach the question of paternity, holding that even if Williams, Sr. was Stone's father, she was not his heir only because of a failure to meet statutory legitimation requirements."). Ms. Mensah never questioned that Osei Bonsu was Nana's biological father; Nana Bonsu's paternity was never in doubt. Therefore Osei Bonsu's name on the birth certificate does not prove that he "acknowledged" Nana Bonsu before the Registrar.

This court concludes that the RBDA does not provide an alternate method for legitimation in Ghana. But even if the court were to accept that it provided, in theory, a process for legitimization, this process was not reliable in practice. As the court found above, the Registrar's Office in Ghana was disorganized and no documentation was required to obtain a birth certificate. This finding is supported by the State Department's Foreign Affairs Manual for Ghana, which says that "[r]egistrations not made within one year of an individual's birth are not reliable evidence of a relationship, since registration, including late registration, may often be accomplished on demand, with little or no supporting documentation required." *See* U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL, GHANA RECIPROCITY SCHEDULE, *available at* http://travel.state.gov/visa/frvi/reciprocity/reciprocity_3568.html# docs, at 3 (attached as App. A). The Manual continues, stating that "the appearance of a man's name on a birth document should not be taken as prima facie evidence of legitimate birth or of subsequent legitimation." *Id.* In light of the testimony of the witnesses, the findings of the court, and the State Department's Manual, the court concludes that, even if the RBDA provided a system for legitimation, in practice that system was unreliable. Therefore, Osei

Bonsu's name on Nana Bonsu's 1989 birth certificate copy is not reliable evidence of Nana Bonsu's legitimation.

The court is not persuaded by the government's argument that the RBDA provides a method for legitimation. The conclusory memorandum from the Library of Congress relies only on the RBDA, which this court has rejected. Further, the only evidence in the record that suggests that Bonsu *was* acknowledged by his father, the birth certificate copies, are neither reliable nor credible.

Bonsu has shown by a preponderance of the evidence that the standard for legitimation of children born out of wedlock in Ghana is that which was set forth in *Mallet*. Bonsu has carried his burden of establishing the law of Ghana for legitimation of a child born of two unmarried parents.

## VI. APPLICATION OF LAW TO FACTS

Although Bonsu has argued that the standard for legitimation in Ghana is a two-step process, the language of the Ghanaian High Court in *Mallet* suggests it is a three-step process: care of the mother during pregnancy, acknowledgment of paternity, and a naming ceremony. Therefore, this court will address all three parts. Because the test is conjunctive—the *Mallet* case links the prongs with an "and"—if Bonsu proves that any one of the three prongs was not met, he will have met his burden and proved that he was not legitimated.

### 1. *Naming Ceremony*

■ During the evidentiary hearing before this court, the petitioner, his sister, and his mother all testified that Bonsu had never had a naming ceremony in accordance with the traditions of his father's tribe. It is the role of the father's family to host the naming ceremony, and Nana Bonsu had no contact with his father's family. In fact, they refused to host a naming ceremony for him.

Unlike Nana, Clara had a naming ceremony. During his testimony, Bonsu stated that, because he had never had a naming ceremony and had no relationship with his father, he did not have the same last name as his sister Clara growing up.[9] The court credits the witnesses' testimony that a naming ceremony was not held and finds that Nana Bonsu never had a naming ceremony.

### 2. *Acknowledgment of Paternity*

The *Mallet* court did not define "acknowledgment." Bonsu has argued that acknowledgment is accomplished by care of the mother and a naming ceremony. *See* Pet.'s Br. at 20. Bonsu supports his argument with the statement of the Logan & Associates attorney. *See* JA at 96.

However, considering that *Mallet* lists acknowledgment in conjunction with the other two requirements, this court views it as a separate condition. The only definition for "acknowledgment" that has been proposed in the record is the government's argument that acknowledgment occurs when the father goes before the Registrar in order to place his name on the birth certificate. Even using the government's definition, however, the court finds that Nana Bonsu's paternity was not acknowledged. As addressed above, the registration process is so unreliable that Osei Bon-

---

**9.** Petitioner's 1989 birth certificate copy (dated April 12) lists his name as Nana Osei. *See* Pet.'s Exhibit 1. In contrast, his sister's birth certificate copy, also dated in April 1989, lists her name as Clara Bonsu. *See* Resp.'s Ex.

103. While these documents could provide some support for petitioner's position that Osei's family never held a naming ceremony for Nana, the court has found them generally to be unreliable. *See supra* at 278.

su's name on the birth certificate is not proof that he went to the Registrar's Office and acknowledged his paternity. Further, the court credits the testimony of Ms. Mensah that Osei Bonsu did not go with her to the Registrar's Office. Therefore, this court finds that Osei Tutu Bonsu has not acknowledged his paternity of the petitioner, assuming the government's form of acknowledgment pertains.

### 3. *Care of the Mother During her Pregnancy*

Ms. Mensah testified before this court that Nana's father did not live with her during her pregnancy and, although he gave her some food and money for Clara, it was not enough to support herself. The court concludes, based on this testimony, that Bonsu's father did not "care" for her during her pregnancy with Nana Bonsu.

However, at the removal hearing before the IJ, Ms. Mensah gave somewhat confused testimony, which testimony could be read as contradictory:

Q: Did he offer you any economic assistance for you—during your pregnancy?

A: No.

Q: Where was Clara living when you were pregnant with Nana?

A: Clara was living with me.

Q: Okay. And did he continue to support Clara?

A: Yes.

Q: But he—did he support you?

A: Well, I was living with him, so, you know.

Q: Were you, were you living with him or were you living with—

A: I was living my mother and Clara. Clara was with me. So he was supporting us, me and Clara.

Q: Okay.

A: But after Nana was born, you know, he stopped coming around.

*See* Resp.'s Br. at 21–22.[10] Although "care" is not defined in any of the sources before the court, if Ms. Mensah was living with Osei Bonsu, that could fulfill this requirement. On the record before this court, however, the court concludes that Osei Bonsu did not care for Ms. Mensah during her pregnancy with Nana.

However, even if Osei Bonsu did live with and care for Ms. Mensah for part of her pregnancy, the other two prongs of the test must also be fulfilled—and the court has already determined that Nana Bonsu did not have a naming ceremony and his paternity was never acknowledged. Therefore, because the other two steps in the *Mallet* test were not completed, even if Bonsu's father cared for his mother during her pregnancy, the court finds that Nana Bonsu has not been legitimated under Ghanaian law.

### VII. CONCLUSION

The issue before this court was whether Nana Osei Bonsu had derived citizenship from his mother, a naturalized U.S. citizen. The sole issue in dispute is whether Bonsu's paternity was established by legitimation. The court holds that Bonsu's paternity was not legitimated under Ghanaian law. Therefore, he derived U.S. citizenship by way of his mother's naturalization and his undisputed legal residence in the United States under her sole legal custody under the age of eighteen. He has therefore fulfilled the requirements of former 8 U.S.C. § 1432(a). As a U.S. citizen, Nana Osei Bonsu is not removable and must be

---

**10.** Curiously, the government did not use this testimony, which is included in the Joint Appendix, at the July 15, 2009 hearing.

284

released from custody. The Clerk shall
enter judgment and close the file.
**SO ORDERED.**

 **Ghana Reciprocity Schedule**

**Appendix A**—Continued

Select A Country

*Jump to Country Documents*

Visas Home
Americans Traveling
Abroad
Find a U.S. Embassy

A–Z Subject Index
Visa Questions?
Temporary Visitors
to the U.S.
Immigrants to the
U.S.
Visa Bulletin
Forms
Fees and Reciprocity
Tables
Frequently
Requested Visa
Information
Laws, Regulations
and Policy
About Visa Services

| Visa Classification | Fee | Number of Applications | Validity Period |
|---|---|---|---|
| A–1 | None | Multiple | 60 Months |
| A–2 | None | Multiple | 60 Months |
| A–3 [1] | None | Multiple | 24 Months |
| B–1 | None | Multiple | 60 Months |
| B–2 | None | Multiple | 60 Months |
| B–1/B–2 | None | Multiple | 60 Months |
| C–1 | None | Multiple | 24 Months |
| C–1/D | None | Multiple | 24 Months |
| C–2 | None | Multiple | 24 Months |
| C–3 | None | Multiple | 24 Months |
| D | None | Multiple | 24 Months |
| E–1 [2] | No Treaty | N/A | N/A |
| E–2 [2] | No Treaty | N/A | N/A |
| F–1 | None | Multiple | 48 Months |
| F–2 | None | Multiple | 48 Months |
| G–1 | None | Multiple | 60 Months |
| G–2 | None | Multiple | 60 Months |
| G–3 | None | Multiple | 60 Months |
| G–4 | None | Multiple | 60 Months |
| G–5 [1] | None | Multiple | 24 Months |
| H–1B | None | Multiple | 60 Months [3] |
| H–1C | None | Multiple | 60 Months [3] |
| H–2A | None | Multiple | 60 Months [3] |
| H–2B | None | Multiple | 60 Months [3] |
| H–2R | None | Multiple | 60 Months [3] |
| H–3 | None | Multiple | 60 Months [3] |
| H–4 | None | Multiple | 60 Months [3] |
| I | None | Multiple | 12 Months |
| J–1 [4] | None | Multiple | 12 Months |
| J–2 [4] | None | Multiple | 12 Months |
| K–1 | None | One | 6 Months |
| K–2 | None | One | 6 Months |
| K–3 | None | Multiple | 24 Months |
| K–4 | None | Multiple | 24 Months |
| L–1 | None | Multiple | 60 Months [3] |
| L–2 | None | Multiple | 60 Months [3] |
| M–1 | None | Multiple | 24 Months |
| M–2 | None | Multiple | 24 Months |

| Visa Classification | Fee | Number of Applications | Validity Period |
|---|---|---|---|
| N–8 | None | Multiple | 36 Months |
| N–9 | None | Multiple | 36 Months |
| NATO 1–7 | N/A | N/A | N/A |
| O–1 | None | Multiple | 60 Months [3] |
| O–2 | None | Multiple | 60 Months [3] |
| O–3 | None | Multiple | 60 Months [3] |
| P–1 | None | Multiple | 60 Months [3] |
| P–2 | None | Multiple | 6 Months [3] |
| P–3 | None | Multiple | 6 Months [3] |
| P–4 | None | Multiple | 60 Months [3] |
| Q–1 [6] | None | Multiple | 15 Months [3] |
| R–1 | None | Multiple | 24 Months |
| R–2 | None | Multiple | 24 Months |
| S–5 [7] | None | One | 1 Month |
| S–6 [7] | None | One | 1 Month |
| S–7 [7] | None | One | 1 Month |
| T–1 [9] | N/A | N/A | N/A |
| T–2 | None | One | 6 Months |
| T–3 | None | One | 6 Months |
| T–4 | None | One | 6 Months |
| T–5 | None | One | 6 Months |
| TD [5] | N/A | N/A | N/A |
| V–1 | None | Multiple | 120 Months |
| V–2 | None | Multiple | 120 Months [8] |
| V–3 | None | Multiple | 120 Months [8] |

## Documents

### Birth Certificates

Available. Persons over 18 years of age must apply in person at the appropriate Registrar's Office. Records of registrations more than one year old are deposited with the Office of the Registrar of Births and Deaths for Ghana, C/O Ministry of Local Government, P.O. Box M.270, Accra, Ghana. If the applicant resides outside of Ghana, the person applying must present a written authorization from the individual whose birth certificate is being requested. Persons under 18 years of age must have their parent or guardian obtain the certificate. There may be a fee for this service.

*Note:* The majority of registrations are not made at the time of birth, and often no registration is made until an individual requires a birth certificate for immigration purposes. Registrations not made within one year of an individual's birth are not reliable evidence of relationship, since registration, including late registration, may often be accomplished upon demand, with little or no supporting documentation required.

Ghanaian authorities issue two documents as evidence of birth. A "Birth Certificate" is provided to the person making registration at the time of registration. This document which bears no seal, may be white, light gray, ledger green, or light blue, and, in recent years, has often been forged. The "Certified Copy of Entry in the Register of Births," also called "Certified True Copy of Entry in the Register of Birth," is provided to persons who request birth doc-

umentation at some time after the initial registration. This document, which is either white or pink, is approximately 6–1/2 inches by 18 inches and bears the raised seal of the Registrar of Births and Deaths for Ghana. Persons registered before March 1957 received a "Certificate of Registration of Birth" at the time of registration. This document is approximately 5 inches square and was issued by the Government of the Gold Coast Colony. It bears no raised seal.

**Secondary Evidence:** Because of the prevalence of late registrations, secondary evidence of birth is often required. Common secondary evidence includes midwife's certificates of birth, weight cards or welfare centre cards, and baptismal certificates. Recent affidavits by relatives or friends are not reliable.

**Illegitimacy:** Ghanaian birth documents do not indicate the marital status of the parents, and the appearance of a man's name on a birth document should not be taken as prima facie evidence of legitimate birth or of subsequent legitimation.

## Marriage Certificates

Available for marriages entered into under civil law from the Principal Registrar of Marriages, C/O Registrar General's Office, P.O. Box 118, Accra, Ghana. There is a fee for this service. Most marriages are performed under customary law, and written records are kept only if the couple chooses to register the marriage with the local council. Persons married under customary law who subsequently wish to marry under civil law must obtain a civil marriage certificate which reflects the words "married under native customary law" in the space provided for "condition." Polygamous marriage is permissible under the customary law of some groups, but not under civil law.

## Divorce Certificates

Available. Certificates for the dissolution of a civil marriage may be obtained from the court that granted the divorce. Proper documentation of the dissolution of a customary marriage is a decree, issued by a high court, circuit court or district court under the Matrimonial Causes Act of 1971 (Act 367), Section 41(2), stating that the marriage in question was dissolved in accordance with customary law. Affidavits or "statutory declarations" attesting to a divorce under customary law, even when duly sworn, do not constitute proper documentation of the dissolution of a Ghanaian customary marriage.

## Death Certificates

Available. A certified true copy of an entry in the Register of Deaths may be obtained from the appropriate Registrar's Office. Records more than one year old are deposited with the Office of the Registrar of Births and Deaths for Ghana, C/O Ministry of Local Government, P O. Box M.270, Accra, Ghana. There is a fee for this service.

## Police Records

Ghana Police Clearance Certificate: Available. Residents of Ghana should report to the headquarters branch of the Criminal Investigations Division of the Ghana Police Authority in Accra, where a fingerprint sample will be taken. Cost for preparation of the certificate is approximately $7 USD (higher for expedited service), payable in local currency, for preparation within 7 days. Non-residents should forward a letter of request for a Police Certificate for immigration Purposes. Accompanying the letter should be a certified sample of the applicant's fingerprints and an international money order in the amount of $80 USD made out to "Commis-

sioner of Police, Ghana." Forward these documents to the following address:

Commissioner of Police

Criminal Investigations

Department Headquarters

PO Box 505

Accra, Ghana

### Prison Records

Available. In the case of a person who has been incarcerated, a prison record may be obtained from the Director of Prisons, P.O. Box 129, Accra. There may be a fee for this service. Processing time varies, depending on the length of the sentence, how long ago and in what prison the sentence was served.

### Military Records

Available. In the case of a person who has served in the Gold Coast or Ghana Armed Forces, a military record may be obtained from the Director of Personnel Administration, Ministry of Defense, Burma Camp, Accra, Ghana.

### Passport and Other Travel Documents

**Certificate of Identity:** issued to residents of Ghana until citizenship status is determined. The document bears a validity date and ceases to be valid if the bearer obtains a national passport. Certificate of Commonwealth Citizenship and Laissez–Passer is issued to citizens of the Commonwealth who are residents of Ghana and who are not in possession of their own national travel document. The Certificate meets the passport requirements of Section 101(a)(30) of the Act and is valid for a period of one year in the first instance and may be renewed as circumstances demand.

**Diplomatic Passports Revoked:** The new Government of Ghana announced on January 23, 200, that all diplomatic and service passports issued to former Ministers, parliamentarians, and government functionaries of the past government are invalid. The Ministry of Foreign Affairs declared the revocation retroactive to January 7, 2001, the day when the new government assumed office.

### Special Clearance and Issuance Procedures

None.

### Visa Issuing Post

*Accra, Ghana* (Embassy)

US Embassy

No. 24, Fourth Circular Rd., Cantonments, Accra

P.O. Box 194

Accra, Ghana

Telephone: (233) 21–741–000

After Hours Emergency: (233) 21–741–775

Fax: (233) 21–741–389

Consular Section

No. 19 Fifth Link Rd.

Cantonments, Accra

Accra, Ghana

Telephone: (233) 21–741–100

Fax: (233) 21–741–362/741–426

Email: consulateaccra@state.gov

Mailed in Ghana:

Consular Section

US Embassy

P.O. Box GP 194

Accra, Ghana

Mailing Address from the United States:

Consular Section

US Dept. of State

2020   Accra Place

Washington, DC 20521–2020

Tel: (233–21) 775–347 or 775–348

Fax: (233–21) 701–1813

**Visa Services**

All categories for all of Ghana.