6 U.S. 64 (1804)
2 Cranch 64
ALEXANDER MURRAY, Esq.
v.
SCHOONER CHARMING BETSY.
Supreme Court of United States.
February 22, 1804.
*70 The cause was argued at last term, by Martin, Key, and Mason for the claimant.
No counsel was present for the libellant.
*115 Marshall, Chief Justice, delivered the opinion of the court: 
The Charming Betsy was an American built vessel, belonging to citizens of the United States, and sailed from Baltimore, under the name of the Jane, on the 10th of April, 1800, with a cargo of flour for St. Bartholomew's; she was sent out for the purpose of being sold. The cargo was disposed of at St. Bartholomew's; but finding it impossible to sell the vessel at that place, the captain proceeded with her to the island of St. Thomas, where she was disposed of to Jared Shattuck, who changed her name to that of the Charming Betsy, and *116 having put on board her a cargo consisting of American produce, cleared her out as a Danish vessel for the island of Guadaloupe.
On her voyage she was captured by a French privateer, and eight hands were put on board her for the purpose of taking her into Guadaloupe as a prize. She was afterwards recaptured by captain Murray, commander of the Constellation frigate, and carried into Martinique. It appears that the captain of the Charming Betsy was not willing to be taken into that island; but when there, he claimed to have his vessel and cargo restored, as being the property of Jared Shattuck, a Danish burgher.
Jared Shattuck was born in the United States, but had removed to the island of St. Thomas while an infant, and was proved to have resided there ever since the year 1789 or 1790. He had been accustomed to carry on trade as a Danish subject, had married a wife and acquired real property in the island, and also taken the oath of allegiance to the crown of Denmark in 1797.
Considering him as an American citizen who was violating the law prohibiting all intercourse between the United States and France or its dependencies, or the sale of the vessel as a mere cover to evade that law, captain Murray sold the cargo of the Charming Betsy, which consisted of American produce, in Martinique, and brought the vessel into the port of Philadelphia, where she was libelled under what is termed the non-intercourse law. The vessel and cargo were claimed by the consul of Denmark as being the bona fide property of a Danish subject.
This cause came on to be heard before the judge for the district of Pennsylvania, who declared the seizure to be illegal, and that the vessel ought to be restored and the proceeds of the cargo paid to the claimant or his lawful agent, together with costs and such damages as should be assessed by the clerk of the court, who was directed to inquire into and report the amount thereof; for which purpose he was also directed to associate with himself two intelligent merchants of the district, and duly inquire what damage Jared Shattuck had sustained by reason of the premises. If they should be of opinion that the *117 officers of the Constellation had conferred any benefit on the owner of the Charming Betsy by rescuing her out of the hands of the French captors, they were in the adjustment to allow reasonable compensation for the service.
In pursuance of this order the clerk associated with himself two merchants, and reported, that having examined the proofs and vouchers exhibited in the cause, they were of opinion that the owner of the vessel and cargo had sustained damage to the amount of 20,594 dollars and 16 cents, from which is to be deducted the sum of 4,363 dollars and 86 cents, the amount of monies paid into court arising from the sales of the cargo, and the further sum of 1,300 dollars, being the residue of the proceeds of the said sales remaining to be brought into court, 5,663 dollars and 86 cents. This estimate is exclusive of the value of the vessel, which was fixed at 3,000 dollars.
To this report an account is annexed, in which the damages, without particularizing the items on which the estimate was formed, were stated at 14,930 dollars and 30 cents.
No exceptions having been taken to this report, it was confirmed, and by the final sentence of the court captain Murray was ordered to pay the amount thereof.
From this decree an appeal was prayed to the circuit court, where the decree was affirmed so far as it directed restitution of the vessel and payment to the claimant of the net proceeds of the sale of the cargo in Martinique, and reversed for the residue.
From this decree each party has appealed to this court.
It is contended on the part of the captors in substance,
1st. That the vessel Charming Betsy and cargo are confiscable under the laws of the United States. If not so,
2d. That the captors are entitled to salvage. If this is against them,
3d. That they ought to be excused from damages, *118 because there was probable cause for seizing the vessel and bringing her into port.
1st. Is the Charming Betsy subject to seizure and condemnation for having violated a law of the United States?
The libel claims this forfeiture under the act passed in February, 1800, further to suspend the commercial intercourse between the United States and France and the dependencies thereof.
That act declares "that all commercial intercourse," &c. It has been very properly observed, in argument, that the building of vessels in the United States for sale to neutrals, in the islands, is, during war, a profitable business, which Congress cannot be intended to have prohibited, unless that intent be manifested by express words or a very plain and necessary implication.
It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.
These principles are believed to be correct, and they ought to be kept in view in construing the act now under consideration.
The first sentence of the act which describes the persons whose commercial intercourse with France or her dependencies is to be prohibited, names any person or persons, resident within the United States or under their protection. Commerce carried on by persons within this description is declared to be illicit.
From persons the act proceeds to things, and declares explicitly the cases in which the vessels employed in this illicit commerce shall be forfeited. Any vessel owned, hired or employed wholly or in part by any person residing within the United States, or by any citizen thereof residing elsewhere, which shall perform certain *119 acts recited in the law, becomes liable to forfeiture. It seems to the court to be a correct construction of these words to say, that the vessel must be of this description, not at the time of the passage of the law, but at the time when the act of forfeiture shall be committed. The cases of forfeiture are, 1st. A vessel of the description mentioned, which shall be voluntarily carried, or shall be destined, or permitted to proceed to any port within the French Republic. She must, when carried, or destined, or permitted to proceed to such port, be a vessel within the description of the act.
The second class of cases are those where vessels shall be sold, bartered, entrusted, or transferred, for the purpose that they may proceed to such port or place. This part of the section makes the crime of the sale dependent on the purpose for which it was made. If it was intended that any American vessel sold to a neutral should, in the possession of that neutral, be liable to the commercial disabilities imposed on her while she belonged to citizens of the United States, such extraordinary intent ought to have been plainly expressed; and if it was designed to prohibit the sale of American vessels to neutrals, the words placing the forfeiture on the intent with which the sale was made ought not to have been inserted.
The third class of cases are those vessels which shall be employed in any traffic by or for any person resident within the territories of the French Republic, or any of its dependencies.
In these cases too the vessels must be within the description of the act at the time the fact producing the forfeiture was committed.
The Jane having been completely transferred in the island of St. Thomas, by a bona fide sale to Jared Shattuck, and the forfeiture alleged to have accrued on a fact subsequent to that transfer, the liability of the vessel to forfeiture must depend on the inquiry whether the purchase was within the description of the act.
Jared Shattuck having been born within the United *120 States, and not being proved to have expatriated himself according to any form prescribed by law, is said to remain a citizen, entitled to the benefit and subject to the disabilities imposed upon American citizens; and, therefore, to come expressly within the description of the act which comprehends American citizens residing elsewhere.
Whether a person born within the United States, or becoming a citizen according to the established laws of the country, can divest himself absolutely of that character otherwise than in such manner as may be prescribed by law, is a question which it is not necessary at present to decide. The cases cited at bar and the arguments drawn from the general conduct of the United States on this interesting subject, seem completely to establish the principle that an American citizen may acquire in a foreign country, the commercial privileges attached to his domicil, and be exempted from the operation of an act expressed in such general terms as that now under consideration. Indeed the very expressions of the act would seem to exclude a person under the circumstances of Jared Shattuck. He is not a person under the protection of the United States. The American citizen who goes into a foreign country, although he owes local and temporary allegiance to that country, is yet, if he performs no other act changing his condition, entitled to the protection of our government; and if, without the violation of any municipal law, he should be oppressed unjustly, he would have a right to claim that protection, and the interposition of the American government in his favour, would be considered a justifiable interposition. But his situation is completely changed, where by his own act he has made himself the subject of a foreign power. Although this act may not be sufficient to rescue him from punishment for any crime committed against the United States, a point not intended to be decided, yet it certainly places him out of the protection of the United States while within the territory of the sovereign to whom he has sworn allegiance, and consequently takes him out of the description of the act.
It is therefore the opinion of the court, that the *121 Charming Betsy, with her cargo, being at the time of her recapture the bona fide property of a Danish burgher, is not forfeitable, in consequence of her being employed in carrying on trade and commerce with a French island.
The vessel not being liable to confiscation, the court is brought to the second question, which is:
2d. Are the recaptors entitled to salvage?
In the case of the Amelia[*] it was decided, on mature consideration, that a neutral armed vessel in possession of the French might, in the then existing state of hostilities between the two nations, be lawfully captured; and if there were well founded reasons for the opinion that she was in imminent hazard of being condemned as a prize, the recaptors would be entitled to salvage. The court is well satisfied with the decision given in that case, and considers it as a precedent not to be departed from in other cases attended with circumstances substantially similar to those of the Amelia. One of these circumstances is, that the vessel should be in a condition to annoy American commerce.
The degree of arming which should bring a vessel within this description has not been ascertained, and perhaps it would be difficult precisely to mark the limits, the passing of which would bring a captured vessel within the description of the acts of Congress, on this subject. But although there may be difficulty some cases, there appears to be none in this. According to the testimony of the case, there was on board but one musket, a few ounces of powder, and a few balls. The testimony respecting the cutlasses is not considered as shewing that they were in the vessel at the time of her recapture. The capacity of this vessel for offence appears not sufficient to warrant the capture of her as an armed vessel. Neither is it proved to the satisfaction of the court, that the Charming Betsy was in such imminent hazard of being condemned as to entitle the recaptors to salvage.
*122 It remains to inquire whether there was in this case such probable cause for sending in the Charming Betsy for adjudication as will justify captain Murray for having broken up her voyage, and excuse him from the damages sustained thereby.
To effect this there must have been substantial reason for believing her to have been at the time wholly or in part an American vessel, within the description of the act, or hired, or employed by Americans, or sold, bartered, or trusted for the purpose of carrying on trade to some port or place belonging to the French Republic.
The circumstances relied upon are principally.
1st. The process verbal of the French captors.
2d. That she was an American built vessel.
3d. That the sale was recent.
4th. That the captain was a Scotchman, and the muster roll shewed that the crew were not Danes.
5th. The general practice in the Danish islands of covering neutral property.
1st. The proces verbal contains an assertion that the mate declared that he was an American, and that their flag had been American, and had been changed during the cruise to Danish, which declaration was confirmed by several of the crew.
If the mate had really been an American, the vessel would not on that account have been liable to forfeiture, nor should that fact have furnished any conclusive testimony of the character of the vessel. The proces verbal however ought for several reasons to have been suspected. The general conduct of the French West-India cruisers and the very circumstance of declaring that the Danish colors were made during the chase, were sufficient to destroy the credibility of the proces verbal. Captain Murray ought not to have believed that an American vessel trading to a French port in the assumed character of a Danish bottom, would have been without Danish colors.
*123 That she was an American vessel, and that the sale was recent, cannot be admitted to furnish just cause of suspicion, unless the sale of American built vessels had been an illegal or an unusual act.
That the captain was a Scotchman and that the names of the crew were not generally Danish, are circumstances of small import, when it is recollected that a very great proportion of the inhabitants of St. Thomas's are British and Americans.
The practice of covering American property in the islands might and would justify captain Murray in giving to other causes of suspicion more weight than they would otherwise be entitled to, but cannot be itself a motive for seizure. If it was, no neutral vessel could escape, for this ground of suspicion would be applicable to them all.
These causes of suspicion taken together ought not to have been deemed sufficient to counterbalance the evidence of fairness with which they were opposed. The ship's papers appear to have been perfectly correct, and the information of the captain uncontradicted by those belonging to the vessel who were taken with him, corroborated their verity. No circumstance existed, which ought to have discredited them. That a certified copy of Shattuck's oath, as a Danish subject, was not on board, is immaterial, because, being apparently on all the papers a burgher and it being unknown that he was born in the United States, the question whether he had ceased to be a citizen of the United States could not present itself.
Nor was it material that the power given by the owners of the vessel, to their captain to sell her in the West-Indies, was not exhibited. It certainly was not necessary to exhibit the instructions under which the vessel was acquired, when the fact of acquisition was fully proved by the documents on board and by other testimony.
Although there does not appear to have been such cause to suspect the Chairming Betsy and her cargo to have been American, as would justify captain Murray in bringing her in for adjudication, yet many other circumstances combine with the fairness of his character to produce *124 a conviction that he acted upon correct motives, from a sense of duty; for which reason this hard case ought not to be rendered still more so by a decision in any respect oppressive.
His orders were such as might well have induced him to consider this as an armed vessel within the law, sailing under authority from the French republic; and such too as might well have induced him to trust to very light suspicions respecting the real character of a vessel appearing to belong to one of the neutral islands. A public officer entrusted on the high seas to perform a duty deemed necessary by his country, and executing according to the best of his judgment the orders he has received, if he is a victim of any mistake he commits, ought certainly never to be assessed with vindictive or speculative damages. It is not only the duty of the court to relieve him from such when they plainly appear to have been imposed on him, but no sentence against him ought to be affirmed where, from the nature of the proceedings, the whole case appears upon the record, unless those proceedings are such as to shew on what the decree has been founded, and to support that decree.
In the case at bar damages are assessed as they would be by the verdict of the jury, without any specifications of items which can shew how the account was made up, or on what principles the sum given as damages was assessed. This mode of proceeding would not be approved of it was even probable from the testimony contained in the record that the sum reported by the commissioners of the district court was really the sum due. The district court ought not to have been satisfied with a report giving a gross sum in damages unaccompanied by any explanation, of the principles on which that sum was given. It is true captain Murray ought to have excepted to this report. His not having done so however does not cure an error apparent upon it, and the omission to shew how the damages which were given had accrued, so as to enable the judge to decide on the propriety of the assessment of his commissioners, is such an error.
Although the court would in any case disapprove of this mode of proceeding, yet in order to save the parties the costs of further prosecuting this business in the circuit *125 court, the error which has been stated might have been passed over, had it not appeared probable that the sum, for which the decree of the district court was rendered, is really greater than it ought to have been according to the principles by which the claim should be adjusted.
This court is not therefore satisfied with either the decree of the district or circuit court, and has directed me to report the following decree:
Decree of the Court.
THIS cause came on to be heard on the transcript of the record of the circuit court, and was argued by counsel; on consideration whereof, it is adjudged, ordered, and decreed, as follows, to wit: That the decree of the circuit court, so far as it affirms the decree of the district court, which directed restitution of the vessel, and payment to the claimant of the net proceeds of the sale of the cargo in Martinique, deducting the costs and charges there, according to amount exhibited by capt. Murray's agent, being one of the exhibits in the cause, and so far as it directs the parties to bear their own costs, be affirmed; and that the residue of the said decree, whereby the claim of the owner to damages for the seizure and detention of his vessel was rejected, be reversed.
And the court, proceeding to give such further decree as the circuit court ought to have given, doth further adjudge, order, and decree, that so much of the decree of the district court as adjudges the libellant to pay costs and damages, be affirmed; but that the residue thereof, by which the said damages are estimated at 20,594 dollars, 16 cents, and by which the libellant was directed to pay that sum, be reversed and annulled. And this court does further order and decree, that the cause be remanded to the circuit court, with directions to refer it to commissioners, to ascertain the damages sustained by the claimants, in consequence of the refusal of the libellant to restore the vessel and cargo at Martinique, and in consequence of his sending her into a port of the United States for adjudication; and that the said commissioners be instructed to take the actual prime cost of the cargo and vessel, with interest thereon, including *126 the insurance actually paid, and such expenses as were necessarily sustained in consequence of bringing the vessel into the United States, as the standard by which the damages ought to be measured. Each party to pay his own costs in this court and in the circuit court.  All which is ordered and decreed accordingly.
 A true copy.
 E.B. CALDWELL, Clerk
 Sup. Court U. States.
Captain Murray was reimbursed his damages, interest and charges, out of the Treasury of the United States, by an act of Congress, January 31st, 1805.
NOTES
[*] Ante vol. I. p. 1.