**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANJAM PARVEZ KHAN,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney General,

*Respondent.*

No. 07-72586

Agency No.
A076-851-013

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 11, 2009—Stanford, California

Filed September 9, 2009

Before: Dorothy W. Nelson, William A. Fletcher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher;
Concurrence by Judge D.W. Nelson

## COUNSEL

Robert Bradford Jobe, LAW OFFICES OF ROBERT B. JOBE, San Francisco, Callifornia, for the petitioner.

Jeffrey Lawrence Menkin, U.S. DEPARTMENT OF JUS-TICE, Washington, DC, for the respondent.

## OPINION

W.    FLETCHER, Circuit Judge:

Anjam Parvez Khan petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal. The BIA adopted the IJ's finding that Khan was ineligible for both forms of relief because he had engaged in terrorist activity. Because we hold that the IJ properly applied the terrorism bar in the Immigration and Nationality Act ("INA"), we deny the petition for review.

### I.   Background

According to his credible testimony, Khan was born in Kashmir and is a citizen of India. He has been involved in the Kashmiri independence movement since about 1967. Beginning in the early 1970s, Khan worked with the Jammu Kashmir Liberation Front ("JKLF"), a group dedicated to the establishment of an independent Kashmir, though he was never officially a member of the JKLF.

The JKLF had both militant and political factions that, until approximately 1994, were part of the same organization. According to Khan, the two factions operated separately but were "wings of the same organization." In about 1994, the two factions split into different organizations when half of the JKLF renounced violence. Before the split, the political wing of the organization advocated nonviolently for an independent Kashmir, while the militant wing operated an armed insurgency against the Indian government in Kashmir. The militant wing took part in killings of politicians, the kidnaping of the daughter of the Indian Home Minister, and repeated attacks on the Indian Army, including attacks on military convoys.

Khan testified that he was affiliated with only the political wing of the JKLF, that his work with the JKLF was entirely

nonviolent in nature, and that he had no knowledge of the activities of the military wing. However, Khan admitted to knowing that he was "part of that movement, a part of which was an arms struggle" and that the militant wing of the JKLF was carrying out a "war" against the Indian military. But he claimed to be unaware of any kidnappings, bombings, or activity targeting civilians by the militant wing of the group. Khan's work with the JKLF consisted of planning political activities for the JKLF, working to distribute aid through a "central committee" funded by the JKLF, and raising funds for the political wing of the JKLF. However, Khan testified that he turned the money he raised over to the JKLF, not merely to its political wing. He further testified that he was one of the primary organizers of the political wing of the JKLF, and that he advised the political wing on how to spend its funds.

In October 1997, Khan fled India and entered the United States on a nonimmigrant visitor visa. In March 1998, he applied for asylum and was referred to an IJ. Before the IJ, he asserted requests for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

In June 2005, the IJ issued a written decision denying Khan's request for asylum and withholding of removal but granting Khan's request for relief under CAT. The IJ found Khan's testimony to be credible, but held that Khan was statutorily ineligible for asylum or withholding of removal under 8 U.S.C. § 1182(a)(3)(B)(iv)(IV) because he had engaged in terrorist activity. In July 2005, the IJ issued a supplemental decision to account for changes made to the INA by the REAL ID Act, which applied retroactively to cases pending at the time of its enactment. *Rafaelano v. Wilson*, 471 F.3d 1091, 1092 (9th Cir. 2006). The IJ held that the REAL ID Act increased the burden on Khan to show that he had not engaged in terrorist activity. The IJ held that because Khan had failed to meet his burden under the old statute, he necessarily failed under the REAL ID Act.

Both the government and Khan appealed to the BIA. The BIA adopted and affirmed the IJ's decision on January 17, 2007. Khan timely petitioned for review.

## II.   Standard of Review

When the BIA affirms and adopts an IJ's decision, this court reviews the decision of the IJ. *Tapia v. Gonzales*, 430 F.3d 997, 999 (9th Cir. 2005). In reviewing the decision of the IJ, we review constitutional and other questions of law de novo. *Id.*; *Cerezo v. Mukasey*, 512 F.3d 1163, 1166 (9th Cir. 2008). We apply *Chevron* deference to the Attorney General's interpretations of ambiguous immigration statutes, but need not defer if the statute is unambiguous. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). We review agency factual findings and determinations of mixed questions of law and fact for substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 483-84 (1992); *Dhital v. Mukasey*, 532 F.3d 1044, 1050 (9th Cir. 2008) (applying substantial evidence standard to mixed question).

## III.   Discussion

The INA precludes aliens who have engaged in terrorist activity from seeking some forms of relief. In particular, 8 U.S.C. § 1182(a)(3)(B)(i) renders inadmissible certain aliens who have engaged in terrorist activity, have been members or representatives of terrorist organizations, or have encouraged others to engage in terrorist activity. This provision applies to aliens seeking both asylum or withholding of removal through other parts of the statute. Section 1158(b)(2)(A)(v) provides that any alien described in § 1182(a)(3)(B)(i)(I) — i.e., "any alien" who "has engaged in a terrorist activity"— is ineligible for asylum Additionally, § 1231(b)(3)(B)(iv) provides that withholding of removal is unavailable when "there are reasonable grounds to believe that the alien is a danger to the security of the United States." "Reasonable grounds exist to believe that an alien is a danger to security if the alien 'has engaged,

is engaged, or at any time after admission engages in any terrorist activity (as defined in section 1182(a)(3)(B)(iv) . . .).' " *Bellout v. Ashcroft*, 363 F.3d 975, 978 (9th Cir. 2004) (quoting § 1231(b)(3)(B)(iv) and a former version of § 1227(a)(4)(B)). Thus, if an alien "has engaged in a terrorist activity" under § 1182(a)(3)(B)(iv) at any time, he is ineligible for both asylum and withholding of removal. It does not matter that the alien ceased participation in terrorist activity at some point before seeking admission to or relief in the United States.

The statute defines "engag[ing] in terrorist activity" broadly. Section 1182(a)(3)(B)(iv)(IV)(cc) defines "engag[ing] in terrorist activity" to include "solicit[ing] funds or other things of value for . . . a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." An alien's intention in soliciting funds only for nonviolent activity is irrelevant to this definition, even when an organization has separate political and militant wings, because money donated to an organization's political wing is considered to be support for the militant wing as well. *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) ("[M]oney is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.").

The statute also defines "terrorist organization" broadly. The definition includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Subclauses (I) through (VI) of clause (iv) list ways in which an individual or an organization can "engage in terrorist activity." These include committing, planning, soliciting funds for, soliciting individuals for, or provid-

ing material support for a terrorist activity. *Id.* § 1182(a)(3)(B)(iv).

The statute defines a "terrorist activity" as

any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116 (b)(4) of title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any—

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere

personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).

Under these provisions, an alien is ineligible for asylum or withholding of removal if he solicited funds or things of value for an organization that committed, planned, solicited funds for, solicited individuals for, or provided material support for a "terrorist activity," unless the alien can "demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." The IJ found Khan ineligible for relief under these provisions because he solicited funds for the JKLF.

The IJ focused on subsections (I), (II), and (III) of § 1182(a)(3)(B)(iii) in considering whether the JKLF had "engaged in terrorist activity." The IJ found that the JKLF had conducted attacks against the Indian military, including killings, bombings, and attacks on convoys, as well as the kidnapping of the daughter of the Indian Home Minister. The IJ then found that Khan had not met his burden in establishing that he had not known nor reasonably should have known about these terrorist activities.

Khan makes several arguments challenging the IJ's findings. First, Khan argues that his due process rights were violated when the IJ did not conduct a new hearing to allow him to present evidence challenging his ineligibility under the modified standards in the REAL ID Act.

Second, Khan challenges the IJ's determination on the merits, arguing that the JKLF was not a "terrorist organization,"

that he did not know and reasonably should not have known about the JKLF's terrorist activities, and that he is not presently a threat to national security and thus may not be subjected to refoulement. The core of these arguments is that the activities of an organization such as the JKLF that is engaged in armed resistance against an illegitimate government are permitted under international law, and that the definition of "terrorist activity" in the INA does not extend to violent activities in furtherance of such armed resistance so long as those activities comply with international law.

Third, Khan argues that the statute is unconstitutionally vague.

We consider each of these arguments below.

## A.   Due Process Claim

After the IJ's initial ruling, the IJ issued a supplemental decision to account for changes made to the INA by the REAL ID Act. Khan claims that his due process rights were violated because he was not afforded an opportunity to present evidence relevant to his admissibility under the new standards imposed by the REAL ID Act.

Under the previously applicable standard, an alien was required to show, by a preponderance of the evidence, that "he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity." As we explained above, under the REAL ID Act, an alien must "demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(IV)(cc).

[1] Khan's due process claim fails because the REAL ID Act served only to increase Khan's burden. Because Khan failed to meet the "preponderance of the evidence" standard,

he necessarily failed to meet the more stringent "clear and convincing evidence" standard. Further, because Khan failed to show that he should not reasonably have known that his fundraising would further the JKLF's terrorist activity, he necessarily failed to show that he should not reasonably have known the JKLF was a terrorist organization. As explained above, the definition of "terrorist organization" encompasses any group engaged in "terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). If Khan should have known that his fundraising for the JKLF would further its terrorist activities, he also should have known that the JKLF was engaged in terrorist activities and was thus a "terrorist organization."

**[2]** Because Khan had already presented evidence that failed to meet the lower standard pre-REAL ID Act, there was no due process violation in denying him the opportunity to present evidence to meet the higher standard post-REAL ID Act.

### B.   Asylum and Withholding of Removal Claims

Khan challenges the IJ's holding that he is ineligible for asylum and withholding of removal because of his work for the JKLF. The government argues that we lack jurisdiction to review the IJ's determination on the asylum claim. It is uncontested that we have jurisdiction to review whether Khan is ineligible for withholding of removal because he engaged in terrorist activity.

### 1.   Jurisdiction over the Asylum Claim

The government argues that this court lacks jurisdiction to review the BIA's determination that Khan is statutorily ineligible for asylum because he engaged in terrorist activity. We have jurisdiction to determine whether jurisdiction exists. *Flores-Miramontes v. INS*, 212 F.3d 1133, 1135 (9th Cir. 2000).

**[3]** Section 1158(b)(2)(D) provides, "There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v)." Section 1158(b)(2)(A)(v), described above, bars aliens who engage in a terrorist activity from eligibility for asylum. In *Bellout v. Ashcroft,* 363 F.3d 975 (9th Cir. 2004), we held that this provision stripped the court of jurisdiction to review the IJ or the BIA's determination that a petitioner was ineligible for asylum because he engaged in terrorist activity. *Id.* at 977.

However, after we decided *Bellout*, Congress passed the REAL ID Act, which revised this jurisdictional bar. Section 1252(a)(2)(D) provides that "[n]othing . . . in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." The chapter referred to in § 1252(a)(2)(D) includes § 1158(b)(2)(D), the jurisdiction-stripping provision upon which we relied in *Bellout*.

In *Fernandez Ruiz v. Gonzales*, 410 F.3d 585 (9th Cir. 2005), we held that the REAL ID Act restored appellate review over all "constitutional claims or questions of law."[1] *Id.* at 587. In *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007), we held that this principle extended to mixed questions of law and fact. *Id.* at 648. Mixed questions of law and fact are those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." *Id.* at 656-57 (quotation omitted). We held in *Ramadan* that whether undisputed facts constituted "changed circumstances" in a country, as

---

[1]We heard *Fernandez-Ruiz* en banc and vacated the panel opinion. *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006). In our en banc opinion, we adopted the portion of the panel opinion addressing jurisdiction over questions of law. *Id.* at 1124.

defined by the immigration laws, is a mixed question of law and fact over which we have jurisdiction. *Id.*

Where the facts are undisputed, we have extended *Ramadan* to other jurisdiction-stripping provisions. *See, e.g., Ramos Barrios v. Holder*, ___ F.3d ___, 2009 WL 1813469, at *4 (9th Cir. June 26, 2009) (holding that question of whether petitioner had satisfied threshold requirements to qualify for special rule cancellation was mixed question over which we have jurisdiction); *Husyev v. Mukasey*, 528 F.3d 1172, 1178-79 (9th Cir. 2008) (holding that question of whether "extraordinary circumstances" exist to justify a delay in the filing of an application for asylum is a mixed question over which we have jurisdiction)*; Ghahremani v. Gonzales*, 498 F.3d 993, 998-99 (9th Cir. 2007) (holding that question of whether petitioner established "due diligence" in discovering deception, fraud, or error in motion to reopen context is a mixed question over which we have jurisdiction). Additionally, we have held that even when facts are in dispute we have jurisdiction to review a mixed question so long as under any view of the factual record the petitioner has satisfied the relevant legal standard. *Khunaverdiants v. Mukasey*, 548 F.3d 760, 765 (9th Cir. 2008). Therefore, § 1158(b)(2)(D) does not completely deprive this court of jurisdiction to review the IJ's holding that Khan is ineligible for asylum on account of his engaging in terrorist activities.

**[4]** We have jurisdiction to determine the scope and meaning of the statutory terrorism bar, including the definition of "terrorist organization" and "terrorist activity," as these present purely legal questions. We also have jurisdiction to determine whether the JKLF meets this standard. This is a mixed question, because the nature of JKLF's activities is undisputed by the parties, and the question is whether these undisputed facts as found by the IJ meet the legal standard of "terrorist organization." Finally, because the IJ found Khan's testimony credible, whether Khan reasonably should have known of the JKLF's terrorist activity presents a mixed ques-

tion of law and fact over which we have jurisdiction. *See, e.g.*, *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008) (stating that "what a reasonable person should have known" presents mixed question); *Colleen v. United States*, 843 F.2d 329, 331 (9th Cir. 1987) (same).

### 2. Merits of the Asylum and Withholding Claims

Both the asylum and withholding of removal claim turn on whether the JKLF is a terrorist organization, and on whether Khan knew or should have known that it was a terrorist organization. We discuss these questions in turn.

### i. JKLF's Status as a "Terrorist Organization"

As we noted above, the JKLF is a "terrorist organization" under the INA if it committed, planned, solicited funds for, solicited individuals for, or provided material support for "a terrorist activity." Khan seeks to limit the definition of "terrorist activity" in a manner that might exclude the JKLF from the definition of a "terrorist organization."

Khan argues that the definition of "terrorist activity" under § 1182(a)(3)(B)(iii) incorporates international law, and thus excludes legitimate armed resistance against military targets from the definition of "terrorist activity." Under Khan's proposed definition, actions that are illegal under the laws of the regime in power in the alien's country of origin are "unlawful" within the meaning of § 1108(a)(3)(B)(iii) only if these actions violate the international law of armed conflict. We hold that this is not a permissible reading of the statute.

### a. Statutory Text

**[5]** We begin with the text of the statute. As noted above, § 1182(a)(3)(B)(iii) defines "terrorist activity" to include various violent acts that are "unlawful under the laws of the place

where [they are] committed (or which, if [they] had been committed in the United States, would be unlawful under the laws of the United States or any State)." The words "under the laws of the place where it is committed" directly modify the word "unlawful," such that "unlawful" does not just mean generically unlawful, but rather "unlawful" in this specific sense. This text is unambiguous, specifying that "unlawful" actions include actions that are unlawful in the place where they were committed.

**[6]** Khan argues that the BIA's reading of the statute is so broad that it includes within the definition of "terrorist activity" many actions that we generally do not consider to be terrorist in nature. For example, Khan argues that under the BIA's reading, it would include armed resistance by Jews against the government of Nazi Germany. This may be true, but the text does not make an exception for actions that are lawful under international law. An action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that the conduct in question is no longer "unlawful" under the country's domestic law, but Khan has made no argument that that is the case here.

We note that the statute includes a discretionary waiver of the terrorism bar for relief from removal that can be exercised by the Secretary of State or the Secretary of Homeland Security. Section 1182(d)(3)(B)(i) provides

> The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) of this section shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) of this section shall not

apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II) of this section, no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi) of this section, and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians.

This waiver weakens Khan's argument that the BIA's reading of the statutory language is overly broad, because the broad statutory definition is combined with a discretionary waiver by executive branch officials. These officials are in a position to judge the characteristics of particular groups engaging in armed resistance in their home countries, as well as the implications for our foreign relations in determining whether the actions of these groups are terrorist activities.

### b.   Refugee Protocol and Convention

**[7]** Khan also argues that the international law obligations of the United States under the 1967 United Nations Protocol Relating to the Status of Refugees ("the Protocol") compel a narrower definition of "terrorist activity." 19 U.S.T. 6223, 606 U.N.T.S. 268 (Jan. 31, 1967). "The Protocol [binds] parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees [("Refugee Convention")] . . . with respect to 'refugees' defined in Article 1.2 of the Protocol." *INS v.*

*Stevic*, 467 U.S. 407, 416 (1984). Article 1.2 of the Protocol defines "refugee" as an individual who

> owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

UN Protocol, Article 1.2 (relying on Refugee Convention, Article 1A(2)). The Refugee Convention excepts from coverage

> any person with respect to whom there are serious reasons for considering that:
>
> (a) He has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
> (b) He has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>
> (c) He has been guilty of acts contrary to the purposes and principles of the United Nations.

Refugee Convention, Article 1F, 189 U.N.T.S. 150 (Jul. 28, 1951) (adopted in the Protocol, Article 1.2). The Refugee

Convention includes the duty of non-refoulement in Article 33.1, providing that

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Refugee Convention, Article 33.1. Article 33.2 of the Refugee Convention provides an exception from this duty:

> The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country.

Refugee Convention, Article 33.2.

Khan argues that Article 33.2 and Article 1F provide the only permissible grounds on which a country can refoul a refugee. Therefore, he contends that the INA's terrorism bar to relief from removal can only apply to individuals who (1) have been implicated in a crime against peace, a war crime, or a crime against humanity; (2) have committed a serious non-political crime; (3) have been guilty of acts contrary to the purposes or principles of the United Nations; (4) may constitute a danger to the security of this country; or (5) having been convicted by a final judgment of a particularly serious crime, constitute a danger to the community. He argues that the IJ's interpretation of "terrorist activity" covers actions that do not satisfy any of these five criteria, and that such a broad bar to relief from removal therefore violates the United States' international obligations under the Protocol.

**[8]** The United States acceded to the Protocol in 1968, though it did not sign the Convention itself. *Stevic*, 467 U.S. at 416 & n.9. However, the Protocol is not self-executing. *Barapind v. Reno*, 225 F.3d 1100, 1107 (9th Cir. 2000) (citing *Stevic*, 467 U.S. at 428 n.22). A "self-executing" treaty has "automatic domestic effect as federal law upon ratification. Conversely, a 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law." *Medellin v. Texas*, 128 S. Ct. 1346, 1356 n.2 (2008). Therefore, the Protocol does not have the force of law in American courts. Instead, the Supreme Court and our court have both stated that the Protocol "serves only as a useful guide in determining congressional intent in enacting the Refugee Act" of 1980, which sought to bring United States refugee law into conformity with the Protocol. *Barapind*, 225 F.3d at 1106-07; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987); *Stevic*, 467 U.S. at 428 n. 22; *United States v. Aguilar*, 883 F.2d 662, 680 (9th Cir. 1989), *superseded by statute on other grounds*, P.L. No. 99-603, 100 Stat. 3359, *as stated in United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002).

**[9]** These cases do not discuss whether the Protocol is also a "useful guide" in interpreting provisions of the INA that were not enacted with the Protocol in mind, such as the terrorism bars to relief from removal. However, we follow the general rule of the *Charming Betsy* canon that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). Under *Charming Betsy*, we should interpret the INA in such a way as to avoid any conflict with the Protocol, if possible. Khan's argument that the terrorism bar violates the obligations of the United States in the Protocol fails because the Protocol does not conflict with the INA's definition of "terrorist activity."

The Protocol, through Refugee Convention Article 33.2, allows the United States to refoul an individual" whom there

are reasonable grounds for regarding as a danger to the security" of the United States. Neither the Refugee Convention nor the Protocol defines "danger to the security" of the United States. Relying on law review articles, publications of the Office of the High Commissioner for Refugees, and a Canadian Supreme Court opinion, Khan argues that the meaning of "danger to the security" must be limited in three ways. He contends that (1) "danger to the security" can only apply to individuals who pose a present danger to the United States; (2) the danger must be a serious threat to national security; and (3) the danger must be proved, not simply assumed. He further argues, using similar sources, that refoulement is an act of last resort that the United States can employ only after attempting to contain an individual's danger to the country's security through criminal prosecution or removal to a third country.

**[10]** We disagree. We have already stated that "the determination of refugee status . . . is incumbent upon the Contracting State in whose territory the refugee finds himself." *Aguilar*, 883 F.2d at 680 (quoting the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979), which "provides significant guidance in construing the Protocol" (internal quotations omitted)); *see also Maximov v. United States*, 373 U.S. 49, 53 (1963). The INA provides that "an alien who [has engaged in a terrorist activity] shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States." 8 U.S.C. § 1231(b)(3) (indirectly referencing 8 U.S.C. § 1182(a)(3)(B)). This definition, not that expressed in legal commentary or by the courts of other nations, controls in this court. Therefore, the INA's definition of "terrorist activity" not only does not violate the Protocol, but adheres to its specific non-refoulement exception.

**[11]** Even if it did conflict, the administrative discretion in the INA, § 1182(a)(3)(B)(i)(II), might resolve the conflict. In

*Stevic*, the Supreme Court held that, to the extent there were differences between American statutory refugee law and the Protocol, it was acceptable that such differences be accommodated by administrative discretion. *Stevic*, 467 U.S. at 428 n. 22.

### c.   Summary

**[12]** Given both the text of the statute and Khan's failure to point to any binding international law which would alter our understanding of that text, we hold that the definition of "terrorist activity" under the INA does not provide an exception for armed resistance against military targets that is permitted under the international law of armed conflict. Our reading of the statute accords with the interpretation of both the BIA and the Third Circuit, which have both considered similar questions. In *In re S-K-*, 23 I & N Dec. 936 (BIA 2006), the petitioner had been a member of the Chin National Front ("CNF"), which was involved in armed struggle against the Burmese government and undisputedly had committed violent acts that were unlawful within Burma. *Id.* at 937-38. The petitioner argued, as Khan does here, that the definition of unlawful action as applied to certain regimes and in certain conflicts should not be based solely on the domestic laws of the country where the acts were committed, but should account for whether the regime is in fact "legitimate" under international law or norms. *Id.* at 938. The BIA rejected this argument, holding that the language in the statute was clear:

> As noted by the DHS during oral argument, the fact that Congress included exceptions elsewhere in the Act for serious nonpolitical offenses and aliens who have persecuted others, even where persecuted themselves, and that it has not done so in section 212(a)(3)(B), indicates that the omission of an exception for justifiable force was intentional. In fact, having reviewed the statutory sections, we find that Congress intentionally drafted the terrorist bars

> to relief very broadly, to include even those people described as "freedom fighters," and it did not intend to give us discretion to create exceptions for members of organizations to which our Government might be sympathetic. Rather, Congress attempted to balance the harsh provisions set forth in the Act with a waiver, but it only granted the power to make exemptions to the Attorney General and the Secretaries of State and Homeland Security, who have not delegated such power to the Immigration Judges or the Board of Immigration Appeals. . . . [T]here is no exception in the Act to the bar to relief in cases involving the use of justifiable force to repel attacks by forces of an illegitimate regime.

*Id.* at 941. We need not defer under *Chevron* because the text of the statute itself is unambiguous. Based on that fact, we agree with the BIA.

In the only published applicable circuit opinion on this question, *McAllister v. Attorney General*, 444 F.3d 178 (3d Cir. 2006), the Third Circuit has also agreed, holding that the definition of "terrorist activity" under the INA does not contemplate international laws that distinguish between types of conflicts, purposes of resistance groups, and whether citizens were targeted. *Id.* at 187-88.

**[13]** Under our reading of the statute, the IJ's holding that the JKLF meets the definition of a "terrorist organization" is supported by substantial evidence. There is documentary evidence in the record, at least some of which is corroborated by Khan's testimony, that members of the JKLF killed politicians, kidnapped the daughter of the Indian Home Minister, and attacked Indian Army convoys. Each of these activities constitutes "terrorist activity" under § 1182(a)(3)(B)(iii). Therefore, substantial evidence supports the IJ's finding that the JKLF, during Khan's affiliation with the organization, constituted a "terrorist organization" under the statute.

### ii. "Know or Reasonably Should Have Known"

Khan argues that, even if the JKLF was a terrorist organization, he did not know and should not have reasonably known this fact.

Khan admitted that he knew that a wing of the JKLF was dedicated to armed struggle against the Indian government and that he knew that this wing was fighting the Indian Army. Attacks by dissidents on the military of a country constitute terrorist activity under § 1182(a)(3)(B)(iii). Additionally, the record contains many newspaper reports of terrorist attacks attributed to the JKLF. The IJ found these reports credible and that, given these reports, Khan had not demonstrated that he did not know and reasonably should not have known about the JKLF's terrorist activities. For these reasons, the IJ's finding is supported by substantial evidence.

### iii. Summary

[14] The IJ's findings that the JKLF was a terrorist organization, that Khan solicited funds for the JKLF, and that Khan knew or reasonably should have known that the JKLF was a terrorist organization are supported by substantial evidence. We therefore decline to upset the BIA's holding that Khan is ineligible for asylum or withholding of removal.

### C. Vagueness Claim

[15] Khan argues that if the definition of "terrorist activity" as written in the INA is not limited in some way, the statute is unconstitutionally vague. This argument fails. The statute elaborates in great detail what constitutes "terrorist activity." This definition is broad, but it is not unconstitutionally vague. *See McAllister*, 444 F.3d at 186-87. We recognize that the statute includes a discretionary waiver at § 1182(d)(3)(B)(i), and that the statute does not guide the execution of this discretion. However, the issue is whether the terrorist activity bar is

unconstitutionally vague, not whether the criteria for a discretionary waiver of that bar are vague. Such discretion is routinely found throughout the immigration statutes and has been upheld repeatedly. *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984).

## Conclusion

The IJ applied the terrorism bars in the INA properly and the IJ's factual findings are supported by substantial evidence. Khan's due process and vagueness challenges also fail. Therefore, we **DENY** the petition for review.

---

D.W. NELSON, Circuit Judge, concurring:

I agree with the majority that the petition should be denied: Khan solicited funds for the JKLF, an organization he reasonably should have known was a terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(iv). I write separately, however, because I believe that Khan has sufficiently raised the issue of international law and deem it worthy of consideration.

## 1.   Statutory Framework

Because it has not been specifically designated as such, the JKLF can only qualify as a terrorist organization under § 1182(a)(3)(B)(vi)(III). Such a "Tier III" terrorist organization is defined as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, . . . [terrorist] activities." *Id.* § 1182(a)(3)(B)(vi)(III). "Terrorist activity," in turn, is "any activity which is unlawful under the laws of the place where it is committed" and which involves conduct proscribed by subsections (I)-(VI). *Id.* § 1182(a)(3)(B)(iii).

## 2. The Relevance of International Law

In my view, whether conduct is "unlawful under the laws of the place where it is committed" will, under certain circumstances, depend on whether and to what extent the foreign nation at issue has incorporated tenets of international law into its domestic legal regime, for example by acceding to an international agreement with binding obligations.[1] The Geneva Conventions, to which nearly every country in the world is a party, are a prime example. The protections and obligations of the Geneva Conventions are triggered whenever there is an armed conflict, either international or non-international in character, involving a state party. *See* Geneva Convention Relative to the Treatment of Prisoners of War arts. 2, 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. In such a situation, the Geneva Conventions are part of "the laws of the place" where the conflict is occurring. *See* 8 U.S.C. § 1182(a)(3)(B)(iii).

Thus, while a group is not automatically a terrorist organization simply by virtue of engaging in an armed conflict, neither would its participation in such a conflict shield it from the terrorist label. The answer would depend on whether the group had engaged in unlawful conduct. Deliberately targeting noncombatants, for example, is unlawful under the Geneva Conventions and would constitute terrorist activity.

It is worth emphasizing that my view is not premised on carving out an "exception" to the terrorist activity definition for groups engaged in legitimate armed conflict. *See* Maj. op. at 12780 ("[W]e hold that the definition of 'terrorist activity' under the INA does not provide an exception for armed resis-

---

[1] The majority appears to recognize this possibility when it notes that "[a]n action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law." Maj. op. at 12774.

tance against military targets that is permitted under the international law of armed conflict."). My analysis, like that of the majority, turns on whether the conduct in question is unlawful.

The majority recognizes the possibility that an interpretation of "terrorist activity" that ignores international law could lead to some bizarre outcomes, including classifying as terrorists Jews engaged in armed resistance against the Nazis. Maj. op. at 12774. But such anomalous results are not merely hypothetical: the United States military, whose invasions of Afghanistan and Iraq were indisputably "unlawful" under the domestic laws of those countries, would qualify as a Tier III terrorist organization. Accordingly, any individual or group who assisted the U.S. military in those efforts would be ineligible for asylum or withholding of removal. *See* 8 U.S.C. § 1182(a)(3)(B)(iv). This could discourage sympathetic groups from lending support to the U.S. military, knowing it would preclude them from seeking refuge in the U.S. in the future.

The majority contends that such concerns are overblown, pointing to a provision in the statute allowing the Secretaries of State and Homeland Security, in consultation with each other and the Attorney General, to waive the terrorism bar. *See* Maj. op. at 12774-75; *see also* 8 U.S.C. § 1182(d)(3)(B)(i). I hope my colleagues are correct. I, however, am less sanguine than they are about the efficacy of this waiver provision. First, the waiver is entirely discretionary and unreviewable. *See* 8 U.S.C. § 1182(d)(3)(B)(i). Second, the waiver requires the assent of three separate agencies, posing a daunting bureaucratic obstacle to implementation. Third, even without this high administrative hurdle, a waiver seems to me a haphazard and inefficient means of avoiding outcomes—such as classifying the U.S. military as a terrorist organization—that Congress clearly never intended. Finally, because India is a democracy, the waiver provision is not even available in this case. *See id.* ("[N]o . . . waiver may be

extended to a group that has engaged [in] terrorist activity against . . . another democratic country.").

In sum, it is foreseeable that interpreting the statute without reference to international law occasionally will lead to anomalous, and unintended, results, and the availability of individual waivers is, at best, an inadequate piecemeal solution. Consequently, I agree with Khan that international law will sometimes be relevant in determining whether to apply the terrorist bar.

### 3. Application to Khan's Case

Recourse to international law, however, does not help Khan in this case. Although India has ratified the Geneva Conventions, and the JKLF is arguably engaged in a qualifying conflict, substantial evidence supports the conclusion that the JKLF has exceeded the bounds of permissible conduct under the international law of armed conflict. The record indicates that the JKLF has killed moderate politicians, detonated bombs in public places, and claimed responsibility for high-profile kidnapings. Such activities violate the Geneva Conventions, which prohibit the targeting of noncombatants or the taking of hostages. *See* Geneva Conventions art. 3. Accordingly, this conduct is "unlawful" for purposes of § 1182(a)(3)(B)(iii) and constitutes terrorist activity. The JKLF, therefore, qualifies as a Tier III terrorist organization. Because Khan has failed to demonstrate by clear and convincing evidence that he should not reasonably have known that the JKLF is a terrorist organization, I agree with the majority that he is ineligible for asylum or withholding of removal.